413 So.2d 24 (1982)
Bryan F. JENNINGS, Appellant,
v.
STATE of Florida, Appellee.
No. 59299.
Supreme Court of Florida.
April 8, 1982.
*25 James B. Gibson, Public Defender, James R. Wulchak, Chief, Appellate Division, Asst. Public Defender and Michael S. Becker, Asst. Public Defender, Seventh Judicial Circuit, Daytona Beach, for appellant.
Jim Smith, Atty. Gen. and Evelyn D. Golden, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
This cause is before the Court on appeal from a judgment of conviction of first-degree murder, kidnapping, and sexual battery. Agreeing with the recommendation of the jury, the trial court sentenced the appellant, Bryan Jennings, to death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We remand for a new trial.
On May 11, 1979 the nude body of six-year-old Rebecca Kunash was found floating in a Brevard County canal. The autopsy showed that she had been raped, that her skull was fractured, and that the cause of death was asphyxiation. The evidence presented at trial indicates that Jennings broke into the girl's bedroom, held his hand over her mouth and nose until she was unconscious, and then, outside, twice threw her down, striking her head on the pavement. He then took her to a nearby canal where he sexually assaulted her and held her underwater for ten minutes.
At the time of the crime, Jennings was on leave from the Marine Corps, staying in Merritt Island with his family. He has a juvenile record of several arrests and convictions for burglary and trespassing and admits to having a problem involving voyeurism. A short while after the crime, Jennings was arrested on a traffic warrant from Orange County. He was awakened in his cell at 1:00 a.m. on May 12 and questioned about the Kunash murder. After being read his rights, he indicated that he wanted an attorney. The investigator continued to explain Jennings' rights and indicated his willingness to and hope of continuing the questioning at that time. Jennings agreed to talk if given a brief recess. About five minutes later, he returned to the interrogation room and agreed to be questioned without his attorney.
Jennings denied involvement in the crime until pressed by the investigator with the evidence. He then broke down and made an incriminating statement. As a result of this statement, the police obtained some clothes, pictures, and hand-drawn maps that were later introduced into evidence.
Prior to trial the state announced that it intended to call Allen Kruger as a witness. While in jail Kruger had overheard statements made by Jennings to a cellmate. Hearing of this proposed witness, the assistant public defender representing Jennings sought to withdraw because the public defender, through another assistant, had represented Kruger. At this time Kruger had been convicted of second-degree murder and was awaiting sentencing. The trial judge refused to allow counsel to withdraw and both the Fourth District Court of Appeal and this Court denied writs of certiorari to review that decision. A petition for federal habeas corpus relief on the motion to withdraw was denied for failure to exhaust state remedies because the defendant had not yet been tried.
At trial Kruger, who had been sentenced by that time, testified about the conversation. In it, according to Kruger, Jennings admitted the killing and detailed how he had beaten and killed the girl. Jennings' counsel refused to cross-examine Kruger, contending that there was a conflict of interest because the public defender had represented Kruger and that to cross-examine him would constitute a violation of the code of professional responsibility. The trial judge admonished counsel to cross-examine, but he persisted and no cross-examination occurred.
*26 Kruger's testimony was critical in that the statement about which he testified was the only direct evidence of premeditation. While there was circumstantial evidence of premeditation and evidence of felony murder, we cannot say that the jury would have convicted Jennings of first-degree murder without hearing that statement.[1]
Thus, Jennings was deprived of the benefit of cross-examination of a vital and material witness. The opportunity for full and complete cross-examination of critical witnesses is fundamental to a fair trial, which Jennings did not receive. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). See Coco v. State, 62 So.2d 892 (Fla. 1953), cert. denied, 349 U.S. 931, 75 S.Ct. 774, 99 L.Ed. 1261 (1955). We do not, in this proceeding, determine the correctness of the public defender's position because such resolution does not affect the fact that Jennings did not receive a fair trial. That question is better answered in some other proceeding.
Although a new trial is required, we feel obliged to address one other question that will reoccur in a new trial. This is the admissibility of the statement Jennings made as a result of police interrogation and the evidence secured as a consequence thereof. Although we are concerned with some of the language in the majority opinion of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), considering the totality of the circumstances, including the questions and statements of the interrogating officers and the responses thereto, we find that the court properly found the statement to be admissible.[2]
*27 The prelude to the interrogation concerning the crime concluded with an unequivocal agreement to proceed without counsel. Although the continued dialogue between the detectives and the defendant might have been a subtle attempt to have the defendant waive his right to counsel, we can discern no improper persuasion or acts on their part. To sustain Jennings' contention, we would have to say that his request for counsel was unequivocal, plus find that, before the officers could have any dialogue, Jennings would have to have initiated it. We hold that a suspect can waive the presence of counsel even though he has indicated a prior desire to have counsel if the waiver is not coerced, is freely given, and is a continuation of the original dialogue. These circumstances distinguish this case from Edwards. See Nash v. Estelle, 597 F.2d 513 (5th Cir.), cert. denied, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979). We find the confession and the fruits of it properly admitted.
The verdict and sentence are vacated, and the case is remanded for a new trial.
It is so ordered.
ADKINS, BOYD, OVERTON, ALDERMAN, McDONALD and EHRLICH, JJ., concur.
SUNDBERG, Chief Justice, concurring as to retrial, but dissenting as to admission of statement:
Although I concur with the granting of a new trial for the reasons articulated by the majority, I dissent from the majority's holding Jennings' statement admissible at that retrial. I do not believe Jennings' request for counsel was scrupulously honored as *28 required by Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
NOTES
[1] There is evidence that the defendant had an unstable mental condition; his statements to the police disavow any intention to commit murder. Plucking a sleeping child from her bedroom through a window, raping, and then killing her is an extremely atrocious set of circumstances, but, nevertheless, could result in a conviction less than first-degree murder.
[2] The following dialogue preceded the statement:

BY MR. HUDEPOHL: Today's date is May the 12th, 1979, and the time is 0-1-0-8 hours. Present are myself, Agent Hudepohl, and Agent Porter, Brevard County Sheriff's Department, Homicide Squad and Bryan Frederick Jennings.
Q Bryan, for the record, would you please state your full name?
A Bryan Frederick Jennings.
Q Bryan, we would like to interview you in regards to a murder that occurred in Brevard County on 5-11-79, in which you are a suspect.
A Me?
Q Yes, you; do you understand 
A Yeah
Q Okay. I want to advise you of your rights here. This is Brevard County Sheriff's Department interrogation preamble. It states that I, Bryan Frederick Jennings, am aware that I am a suspect for first degree murder. I have been advised and have had explained to me prior to answering any questions, or making any statement either oral or written, that I am entitled to be represented by legal counsel or lawyer. I have also been advised that if I am without funds with which to secure counsel, the State of Florida will furnish me with an attorney. Do you understand that?
A Uh-huh.
Q It has been explained to me that any statement I make or questions that I answer must be free and voluntary without threat of punishment or promise of reward. Do you understand that?
A Uh-huh.
Q I am aware that I have the right to remain silent and not bear witness against myself as guaranteed by the Constitution of the United States of America.
A Uh-huh.
Q It has been explained to me that any statement made by me, either oral or written, can and will be used as evidence against me in court. Do you understand that?
A Yeah.
Q It has also been explained to me that I may have an attorney present to represent me now or at any time during this interview and interrogation; do you understand that?
A Yeah.
Q Okay. I understand that this interview and interrogation can and will be terminated at any time upon my request.
A. Okay.
Q Are you willing to proceed without an attorney being present to represent you? In other words, do you want to go ahead and talk to us now?
A Yeah, but let me wake up a little bit first. This is not good when I just woke up. No, I don't think so; I definitely have to have a lawyer for this. This is too heavy for me to do.
Q Are you fully awake and understand everything that I'm saying to you?
A I'm still half asleep right now, but I'm awake enough to, hey, this is a heavy charge, and I'm not even going to sit here and take this on myself to try and talk about it. Huhuh, not this kid. Now if it was something like burglary, I wouldn't mind it. But, I mean, Christ, this  you're talking about fucking murder, man.
MR. PORTER: That's right, we are.
THE WITNESS: Jesus, look, I've done a lot of things, and lot of them weren't always nice. I ain't never killed nobody, and especially not no seven year old girl.
Q (BY MR. HUDEPOHL) Well, it's your right to exercise however you want to do it, you know. All we  all  you know we're giving you the opportunity to talk to us, but we're required by law to advise you of what your rights are before we do. You know, we're more than willing to sit here and listen to your side of the story and ask you questions and let you answer them, but we have to advise you of your rights. And before we can ask you any questions, you have to intelligently waive those rights. Now, you know, I'll  if you like, and if it's your decision not to talk to us without a lawyer, fine, we'll terminate the interview. If it's your decision that you want me to read, reread something, or whatever you want, you just, you tell us, but we have to know.
It's your decision to make, Bryan, you know; I can't make it for you. Like I say, we're here giving you the opportunity to talk about it and, you know, it's your decision to make.
A All right. Tell me  tell you what, give me about five minutes, walk down here to the bathroom to get some water and clear my head a little bit 
Q Absolutely.
A  and we'll talk.
Q Okay. Let the record reflect that the time is thirteen-fourteen hours and Bryan has indicated he would like to get a drink of water and use the bathroom or whatever, and we'll continue the interview. The tape recorder will be shut off at this time.
(Whereupon the tape recorder was turned off, turned back on at a later time, and the following proceedings were had:)
Q (BY MR. HUDEPOHL) Okay. Let the record reflect that the tape recorder has been turned back on. We're back in the interview room at the jail, time is thirteen-seventeen hours  correction, zero-one-twelve  zero-one-seventeen hours. Bryan, you  you're awake now?
A Yeah.
Q Okay. You  what you do went and had a drink of water?
A Yeah, and washed my face and 
Q Got a cigarette?
A Yeah.
Q You all set now?
A Yeah.
Q Okay, would you like for me to read this rights over to you again?
A No, that's  I 
Q You understand what they are?
A Yeah.
Q Okay. I'll ask you the question again. Are you willing to proceed without an attorney being present to represent you?
A At this time, yes.
MR. PORTER: And any time you want to stop, stop.
THE WITNESS: Okay.
Q (BY MR. HUDEPOHL) All right. Would you sign that right there, please?