492 So.2d 1368 (1986)
Otto HELLMAN, Appellant,
v.
STATE of Florida, Appellee.
No. 84-1900.
District Court of Appeal of Florida, Fourth District.
August 13, 1986.
*1369 Richard L. Jorandby, Public Defender, and Gary Caldwell, Asst. Public Defender, West Palm Beach, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Amy Diem, Asst. Atty. Gen., West Palm Beach, for appellee.
GLICKSTEIN, Judge.
We affirm appellant's conviction of murder in the first degree and sentence of life imprisonment.
There are four issues, which we have restated:
I. Whether the trial court erred by denying the criminal defendant's motion for mistrial when a psychologist witness volunteered that the criterion for involuntary commitment was being a danger to oneself and others. We conclude it did not.
II. Whether the trial court erred by refusing to grant a new trial, because the verdict was contrary to the weight of the evidence. We conclude it did not.
III. Whether the trial court erred by admitting into evidence notebooks purportedly kept by the criminal defendant because the notebooks' content was irrelevant and because the state had not adequately shown the chain of custody. We conclude it did not.
IV. Whether the trial court erred in excusing jurors for their scruples against the death penalty, and by refusing to have separate juries for the issue of guilt and the issue of penalty upon conviction. In light of a very recent United States Supreme Court decision, as well as Florida decisional law, we conclude it did not.

I
Appellant contends a psychologist witness's identification of danger to oneself and others as the criterion for involuntary commitment was so prejudicial that there was no way of curing the prejudice, and therefore a mistrial should have been declared. The reasoning is that the jury would consider the defendant so dangerous that they would be unwilling to find him not guilty by reason of insanity, lest he sooner or later reenter society and perpetrate additional murders.
The state points out that the issue is addressed to the sound discretion of the trial judge, and that the test is the degree to which there has been violation of fundamental notions of fairness. Salvatore v. State, 366 So.2d 745 (Fla. 1979). The power to declare a mistrial should be exercised with great care and only when absolutely necessary. Id.
Generally, a witness's inadvertent suggestion that the defendant has criminal proclivities can be overcome by the judge's instruction to the jury to disregard the statement. See, e.g., Marshall v. State, 439 So.2d 973 (Fla. 3d DCA 1983) (curative instruction sufficient to overcome implication of previous arrest in lab technician's testimony on matching defendant's fingerprints with those in the master file of persons previously booked). The Marshall court cited the following authoritative support:

*1370 Smith v. State, 365 So.2d 405 (Fla. 3d DCA 1978) (if requested, curative instruction would have corrected any prejudice to defendant caused by reference to commissary slips which could only have been signed by one in jail), pet. for review denied, 402 So.2d 613 (Fla. 1981); Williams v. State, 354 So.2d 112 (Fla. 3d DCA 1978) (reference by witness to fact that defendant had been in prison cured by instruction); Flowers v. State, 351 So.2d 764 (Fla. 3d DCA 1977) (denial of motion for mistrial proper when officer's statement that he recognized the defendant from "previous things" was subject of curative instruction). See also Williams v. State, 438 So.2d 152 (Fla. 3d DCA 1983); Evans v. State, 422 So.2d 60 (Fla. 3d DCA 1982); Moore v. State, 418 So.2d 435 (Fla. 3d DCA 1982) (same result where reference is to "mug shot" of defendant).
Id. at 944. We hold the same ought to be true of dangerous propensities.
In the instant case, we do not think it can be surmised that but for Ms. LaFehr's inadvertent mention of the standard for involuntary commitment the jury would have found Hellman innocent. While the witness' accidental mention of the criterion for such commitment is attacked for its prejudicial effect, it seems unlikely that this brief mention could be any more prejudicial than the several defense witnesses' repeated testimony about Hellman's deity complex and, more abstractly, his paranoid schizophrenia. Even absent the inadvertent remark of the psychologist, would not the jury have reason to believe appellant may be dangerous to himself and others, when they had heard of a self-inflicted gunshot wound in the shoulder, and of fourteen bullets fired into Barber? Appellant made no claim he had not shot Barber.
Finally, jury instruction 3.04(b), was given, advising the jury, in its last paragraph, that a verdict of not guilty by reason of insanity does not automatically mean release from custody.

II
The second point on appeal, appellant's most significant issue, is whether the verdict was contrary to the law and the evidence because Hellman was legally insane at the time Barber was killed. If Hellman was at that time legally insane, as appellant contends, the court should have granted the defense motion for a new trial on the ground the verdict was contrary to the weight of the evidence.
Florida adheres to a modernized version of the M'Naghten Rule, as the test for the sanity of the defendant at the time the crime was committed. The Florida Standard Jury Instruction on insanity states this test. Adopted by the Florida Supreme Court in 1976, its correctness was reaffirmed in Wheeler v. State, 344 So.2d 244 (Fla. 1977), wherein it was partially quoted as follows:
The law does not hold a person criminally accountable for his conduct while insane, since an insane person is not capable of forming the intent essential to the commission of a crime. A person is sane and responsible for his crime if he has sufficient mental capacity when the crime is committed to understand what he is doing and to understand that his act is wrong. If at the time of an alleged crime a defendant was by reason of mental infirmity, disease or defect unable to understand the nature and quality of his act or its consequences or, if he did understand it, was incapable of distinguishing that which is right from that which is wrong, he was legally insane and should be found not guilty by reason of insanity.
Insanity may be permanent, temporary or may come and go. It is for you to determine the question of the insanity of the defendant at the time of the alleged commission of the crime.
* * * * * *
Unrestrained passion or ungovernable temper is not insanity, even though the normal judgment of the person be overcome by passion or temper.
Id. at 246 n. 2.
There was testimony both for and against the proposition that, at the time *1371 Hellman shot Barber, he had the mental capacity to understand what he was doing, and to understand that his act was wrong. Surely there was a sufficient basis for putting the question to the jury. We do not comment on the respective parties' burden of proof at trial when we recall that the standard for this court on review is whether there was competent substantial evidence; we may not reweigh the evidence. Tibbs v. State, 397 So.2d 1120 (Fla. 1981). When there is a sufficiency of evidence to support a jury verdict, it is an abuse of discretion for the trial court to grant the defendant's motion for new trial. State v. Bowle, 318 So.2d 407 (Fla. 4th DCA 1975). The appellate court's function is not to reweigh the evidence, but only to ensure its legal sufficiency. Burr v. State, 466 So.2d 1051, 1053 (Fla. 1985). "[A] new trial will not be granted on the ground that the verdict is contrary to law and evidence, there being evidence to support the verdict, however conflicting the testimony of witnesses of the respective parties may be, unless it seems that great injustice will result." Ivey v. State, 132 Fla. 36, 44, 180 So. 368, 372 (1938).
Here there was testimony of witnesses who were in contact with Hellman shortly after the murder, some of which could be interpreted to indicate Hellman knew what he was doing when he shot Barber, and that he knew that shooting someone was wrong. There was testimony of one psychologist that in her opinion Hellman was not legally insane at the time of the murder, even though when she examined him he was about as crazy as anyone she had ever encountered. While several psychiatrists thought Hellman had been legally insane at the time of the crime, they made clear they had to qualify their opinions because they did not deal with the defendant at a time sufficiently close to the time of the crime. A jury reasonably could have found more weighty and credible what was said in support of Hellman's sanity at the time of the crime than the testimony to the contrary.
To conclude that affirming the trial court's denial of the defendant's motion for new trial could result in great injustice would entail reweighing the evidence, not applying the correct standard  that of competent, substantial evidence. Moreover, it is important to bear in mind the great definitional gulf between clinical insanity and legal insanity at the time a crime is committed.

III
The defendant contends that notebooks that were admitted into evidence over objection were not relevant to the trial; and, furthermore, the chain of custody had not been adequately shown, and there was a question of their authenticity.
One of the notebooks admitted contained notations of loans between Hellman and Barber. The other two notebooks contained entries of locations and times, including an entry for a date eighteen days before the commission of the crime. The state said it wanted the notebooks in evidence to show Hellman had an orderly mind; and that it would question the experts on the relation between the content of the notebooks and Hellman's state of mind.
Appellant contends there was no evidence as to who wrote the notebooks or where they came from. He concedes the one notebook concerning the money transactions could reveal motive, but the others, he maintains, were entirely irrelevant. He claims the admission of the notebooks cannot in the circumstances be harmless, as the prosecution used them to undercut the experts' testimony that Hellman was legally insane at the time of the crime.
The state points out that it was clearly shown that one notebook came from Hellman's person and the others from a tote bag in his room. The state contends this is sufficient evidence of authenticity. See Yates v. Bass Ranch, Inc., 379 So.2d 710 (Fla. 4th DCA 1980), together with Clark v. Cochran, 79 Fla. 788, 794, 85 So. 250 (1920). While the state doesn't mention it in argument, there was a certain amount of evidence that shows a chain of custody *1372 after the police took control of the notebooks.
The state argues that the notebooks bore on Hellman's state of mind; that to the extent the time of the writings was remote from the time of the crime, this is a question of weight, rather than of admissibility, so long as the time lapse is not extremely long. Holliday v. State, 389 So.2d 679 (Fla. 3d DCA 1980).
The standard for review of decisions to admit evidence is whether the court abused its discretion. Jent v. State, 408 So.2d 1024 (Fla. 1981). We do not think it can be said the admission of the evidence here being contested was of evidence so inadequately authenticated and so irrelevant as to represent an abuse of discretion. While we conclude error not to have occurred, we also note, inasmuch as many of the experts made clear there was no conflict between insanity and this kind of orderliness, the claimed error, if any, would appear to be harmless.

IV
In the recent case of Lockhart v. McCree, ___ U.S. ___, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the United States Supreme Court held that the United States Constitution does not prohibit removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose conscientious opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase. This would be so even if social science studies that were introduced earlier in the progress of the case conclusively showed that exclusion of such jurors left juries that were more conviction prone than juries in whose voir dire the capital punishment scruple was never considered  which the Court did not concede. "Death qualification" of a jury does not violate the Sixth Amendment requirement that the jury be a fair cross-section of the community, because people who share a certain attitude do not form a distinctive group in the context of improper systematic exclusion. Neither does "death qualification" of a jury violate the right to an impartial jury. An impartial jury is not constructed by balancing the various predispositions of the individual jurors, but consists merely of jurors who will conscientiously apply the law and find the facts. There is a legitimate state interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both phases of a bifurcated capital trial, and the "death qualification" serves this legitimate state interest. See also Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); Dougan v. State, 470 So.2d 697 (Fla. 1985); and Lara v. State, 464 So.2d 1173 (Fla. 1985).
In light of McCree and other authorities cited, Hellman's argument does not hold up. The state correctly points out, moreover, that he has no standing to raise the issue. "Since no death sentence was imposed in this case, the appellant lacks standing to raise this issue on appeal." Herman v. State, 396 So.2d 222, 228 (Fla. 4th DCA 1981).
Finally, the same jury may be used for both phases of a bifurcated capital murder trial. E.g. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). A system of unitary juries is permissible if only those who have conscientious scruples against the death penalty, and not everyone who opposes capital punishment on any basis, is excluded from the jury, and if the jury's discretion as to whether the death penalty should be imposed is not unfettered. See McCree, ___ U.S. at ___-___, 106 S.Ct. at 1768-70, 90 L.Ed.2d at 151-55.
GUNTHER and STONE, JJ., concur.