512 So.2d 169 (1987)
Bryan F. JENNINGS, Appellant,
v.
STATE of Florida, Appellee.
No. 68835.
Supreme Court of Florida.
August 27, 1987.
Rehearing Denied October 22, 1987.
*171 James B. Gibson, Public Defender, and Christopher S. Quarles, Asst. Public Defender, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen., and Kevin Kitpatrick Carson, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
Bryan F. Jennings was convicted of first-degree murder, two counts of first-degree felony murder, kidnapping with intent to commit sexual battery, sexual battery, and burglary in connection with the 1979 abduction and death of six-year-old Rebecca Kunash.[1] Following a penalty hearing, the jury recommended he be executed. The trial court imposed the death sentence. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the convictions and the sentence of death.
Appellant alleged sixteen errors in the guilt and penalty phases of the trial. Several merit discussion.

Guilt phase
Point I concerns whether application of the "fruit of the poisonous tree" doctrine, Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), required the suppression of certain photographs taken as a result of an illegally obtained confession. Appellant confessed after his arrest, but that confession was suppressed by our ruling in Jennings v. State, 473 So.2d 204 (Fla. 1985). Thereafter, the court denied appellant's motion to suppress photographs which showed two abrasions on appellant's penis. The relevancy of the photographs was that a pathologist had said that the person who raped the physically immature victim would have likely injured his penis. The trial judge permitted the introduction of the photographs on the premise that regardless of the confession, they would inevitably have been obtained in the course of the investigation.
Assuming without deciding[2] that the poisonous tree doctrine applies to physical evidence obtained as a consequence of a voluntary confession elicited in violation of *172 the prophylactic rules of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny, we agree that the photographing of appellant's genitalia would have been accomplished irrespective of his confession. See Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Appellant became one of many suspects early in the investigation, due in part to his having been accused as a juvenile of burglary and in part because his physical description matched that of an unknown man who had been seen in the victim's neighborhood around the time of her abduction. Further investigation showed that appellant's shoes matched footprints found at the victim's house, his fingerprints were found at the house, and he had returned home on the night of the murder with his clothes and hair wet (the victim's body had been found in a canal). The police had probable cause to arrest the defendant without the confession, and the photographs would have been inevitably obtained.
Point II concerns the admissibility of a prior sworn statement of a state witness which was inconsistent with his trial testimony. Clarence Muszynski, a cellmate of appellant's, testified that appellant told him how he had broken into the sleeping victim's room, taken her outside and bashed her head on the pavement, driven her to a canal, raped her, and then held her underwater until she was drowned and where her body would be disposed of by "the sharks and the turtles and the fish and the animals of the sea... ." Defense counsel sought to attack Muszynski's credibility by showing that he had alleged in his own sworn pretrial motions that he was insane. Muszynski acknowledged having made the motions and admitted to lying therein. As part of appellant's case, defense counsel sought to introduce the sworn motions into evidence. Appellant now argues that the court erred in sustaining the state's objection to the introduction of these motions.
The motions could not be introduced for purposes of impeachment because Muszynski admitted that he had made the prior inconsistent statements. § 90.614(2), Fla. Stat. (1985). The statements were not admissible as an exception to the hearsay rule for purposes of substantive evidence because they were not given "at a trial, hearing, or other proceeding or in a deposition." § 90.801(2)(a), Fla. Stat. (1985). In any event, appellant received whatever benefits the motions could give him because their contents were made clear to the jury and defense counsel read aloud the oath in its entirety.
Point III concerns statements made by the victim's father and her school principal that on the day she was killed the child was going to be narrator at her school play because she had learned to read faster than her classmates. Appellant argues these statements should not have been admitted because they had no relevance and served only to play upon the jurors' sympathies. To the contrary, the testimony was relevant in that it tended to show that the victim was looking forward to her role and thus would not have left home willingly. Moreover, on this record, testimony of this nature could not have affected the outcome of appellant's trial.
Point V deals with photographs of the victim. Appellant says these postmortem photos were so inflammatory their potential prejudice outweighed their slight probative value. We disagree. The photographs were not so shocking in nature as to defeat the value of their relevancy. Bush v. State, 461 So.2d 936, 939-940 (Fla. 1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986); State v. Wright, 265 So.2d 361, 362 (Fla. 1972).

Penalty phase
Point IX raises an issue that is, if not unique, at least unusual. After the jury had been sworn and some testimony given, a juror told the court she had not been completely candid about her feelings concerning the death penalty. She stated that while she still could render an impartial verdict in the guilt phase, she could not recommend a death sentence. When informed of the juror's comments, the state did not object to her sitting in the guilt *173 phase but announced that it would request her removal if a penalty phase were necessary. Defense counsel did not object to her participation in the determination of guilt or innocence but declined to stipulate to her replacement for the penalty phase. Before the penalty phase, the trial court granted the state's motion to substitute that juror with an alternate. Appellant now argues that his right to a fair trial was abridged by interfering with the "magical" composition of the jury in the middle of the trial.
The trial judge has broad discretion in deciding whether a juror may sit. Calloway v. State, 189 So.2d 617 (Fla. 1966). Aside from the fact that neither side requested it, we see no compelling reason why the judge should have excused the juror from the guilt phase. She said that despite her feelings about imposing the death penalty she would render a verdict as to guilt or innocence based solely on the law and the evidence. Therefore, section 913.13, Florida Statutes (1985), does not apply, as it disqualifies only those who cannot vote for guilt in a capital case.
In Tresvant v. State, 359 So.2d 524 (Fla. 3d DCA 1978), cert. denied, 368 So.2d 1375 (Fla. 1979), the court approved the substitution of an alternate juror when it was learned midway through a criminal trial that one of the impaneled jurors had failed to disclose on voir dire a series of prior arrests. The court said:
Concealment by a juror on voir dire of information which may have been of materiality as to whether the juror would be excused on peremptory challenge or for cause, which having occurred is not revealed or discovered until after trial, can justify the granting of a new trial. Skiles v. Ryder Truck Lines, Inc., 267 So.2d 379 (Fla. 2d DCA 1972). Therefore, when such occurs and is disclosed during a trial, a mistrial would be indicated unless, as in this instance, there is available an acceptable alternate juror to replace the offending juror when removed. United States v. Taylor, 554 F.2d 200 (5th Cir.1977). It follows that if there existed a legal need to excuse the juror in question, the procedure employed in this case did not constitute error in law; and if the situation did not legally require the removal of the juror for cause her removal with substitution of the alternate juror was not shown to have caused any prejudice and, if error, was harmless.
359 So.2d at 526.
Likewise, in the instant case we cannot see how the trial judge's solution to this unusual problem could have prejudiced the appellant. At the outset, we note that it may be to a defendant's advantage (though obviously it was not here) to have a juror who is apprehensive about the death penalty consider guilt or innocence. Moreover, this juror could not have had the same influence on the penalty phase as she would have had in the guilt phase. (Indeed the jury vote was eleven to one.) Finally, the fact that the alternate did not deliberate guilt with the other panel did not prevent that juror from reaching a sound decision as to the penalty. Florida Rule of Criminal Procedure 3.280 authorizes the court to substitute alternates for jurors who "become unable or disqualified to perform their duties." Had the subject juror originally stated during voir dire that she could not vote for death at the penalty phase, she would have been subject to removal for cause. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); Hellman v. State, 492 So.2d 1368 (Fla. 4th DCA 1986).
We also note that under Florida's bifurcated system for capital cases a judge is given authority to change the jury panel under certain circumstances. "If, through impossibility or inability" the trial jury cannot reconvene for the penalty phase, the judge "may summon a special juror or jurors... ." § 921.141(1), Fla. Stat. (1985). While the legislature may not have envisioned a situation such as that which confronted the court in this case, the judge's actions were consistent with the procedures embodied in that statute.
Point XI involves the discovery by three jurors between the guilt and penalty phases that the appellant had been tried before for the same crimes. Appellant argues *174 that this knowledge on the part of the jurors deprived him of his constitutional right to a fair trial on the issue of his penalty. As evidence that the jury may have been influenced, appellant points to the fact that during their deliberations the jury sent a note to the judge asking him if they were allowed to know the reasons for the retrials. The judge replied that the question and answer "should not be considered by you... ."
It is not uncommon that jurors become aware that the case before them may have been previously tried as a result of references to prior testimony. There is no indication that the jurors knew what had occurred at appellant's previous trial. We conclude that the judge made the appropriate response and committed no error in denying appellant's motion for mistrial.
Point XII concerns an alternate juror leaving the courtroom at the same time as the jury panel when it retired to deliberate for the penalty phase. Appellant argues that this event tainted the jury to the extent that he was denied a fair trial. The facts, as revealed by the record, do not back up that assertion. The record shows that when the trial judge sent the jury off to deliberate appellant's penalty, he did not discharge an alternate juror but that the omission was discovered quickly. The record reads:
(Thereupon, at 3:15 o'clock p.m., the jury retired to deliberate, after which the proceedings resumed as follows:)
MR. HOLMES [the prosecutor]: There is one matter, I believe, your honor. You have an alternate on the jury.
THE COURT: Bring the jury back. I am glad you caught that. Give me the jury list please.
MR. HOWARD [defense counsel]: It is Mr. Chandler.
THE COURT: All right, ask Mr. Chandler to come in. You can take the remaining jurors to the jury room. (Emphasis supplied.)
Defense counsel made no motion for mistrial and neither counsel nor the court found it necessary to question the alternate with respect to whether he ever reached the jury room. We are satisfied that the alternate juror did not participate in the jury deliberations and that no error occurred.
In point XIV appellant argues that the trial judge erred in failing to certify him as a mentally disordered sex offender. Since 1979, the Florida law has dispensed with the need for court certification of mentally disordered sex offenders. However, the mentally disordered sex offender statute in effect on the date of the crime controls. Strachen v. State, 380 So.2d 487 (Fla. 3d DCA 1980). Since appellant's crimes were committed at a time when Chapter 917, Florida Statutes (1977), required judicial determinations of mentally disordered sex offenders, the court held a hearing for this purpose with respect to appellant.
At the hearing, three doctors testified that appellant met the medical criteria for a mentally disordered sex offender. A fourth doctor was not specifically asked whether appellant so qualified. Thus, appellant argues that the court abused its discretion in refusing to stay the sentencing proceedings while appellant could be committed to the Department of Health and Rehabilitative Services for treatment.
Section 917.13(1), Florida Statutes (1977), provided:
(1) A "mentally disordered sex offender" or "offender" is a person who:
(a) Has been convicted of or pleaded guilty or no contest to a sex offense or attempted sex offense in a current prosecution;
(b) Suffers from a nonpsychotic mental or emotional disorder, yet is competent; and
(c) Is likely to commit further sex offenses if permitted to remain at liberty.
In declining to certify appellant as a mentally disordered sex offender, the court stated:
(1) The murder is not the type of crime contemplated by Section 917.13(4) or *175 917.18, Florida Statutes (1979), since it was not motivated by sexual gratification.
(2) The disorder suffered by the defendant is not the type contemplated by Section 917.13(1), Florida Statutes (1979) in that the disorder is likely to cause him to commit more than just sex offenses if he remains at liberty. A limited treatment program would be inconsistent with his condition and ineffective in protecting the public.
(3) There is no known effective means of treating the defendant's disorder.
Mentally disordered sex offender status cannot be denied because the defendant's prognosis is poor, Durbin v. State, 385 So.2d 172 (Fla. 4th DCA 1980), and the statute does not preclude treatment simply because a defendant is likely to commit more than just sex offenses. However, we do agree that the statute does not encompass first-degree murder. While the murder in this case could be said to have had sexual overtones, murder is not a sex offense as such. The fact that the prior definition of mentally disordered sex offender included all those who had a mental disorder and were considered dangerous to others because of a propensity to commit sex offenses, section 917.13, Florida Statutes (1975), suggests that the 1977 legislature intended to narrow the definition to those who had committed only specific sex crimes. We also note that in 1974 the legislature repealed section 917.23, which provided that the mentally disordered sex offender provisions were applicable to persons convicted of capital offenses. Ch. 74-379, Laws of Fla. (1974).
There remains the question of what to do about the sentences for the remaining crimes.[3] Our analysis concerning first-degree murder is also applicable to the burglary conviction since the burglary as alleged and committed did not constitute a sex offense. However, the kidnapping with intent to commit sexual battery and the sexual battery meet the definition of a sex offense. Since there was no evidence otherwise demonstrating that appellant did not qualify, the court should have certified him a mentally disordered sex offender with respect to those crimes. Sullivan v. State, 413 So.2d 152 (Fla. 4th DCA 1982). The failure to do so requires that the sentences for kidnapping and sexual battery be reversed. In view of our disposition of the murder and the burglary charges and the fact that the treatment of mentally disordered sex offenders is now entirely an administrative matter, there appears to be no present need for further legal action concerning these sentences. However, should the state seek to have appellant resentenced for these crimes, we direct that the court first hold a new hearing to see if treatment pursuant to Chapter 917 is required before sentencing can take place.
In point XV, appellant argues that the death penalty was imposed upon inappropriate aggravating circumstances and that certain mitigating circumstances should have been found which would outweigh the aggravating circumstances. In the course of discussing aggravating circumstances in his sentencing order, the trial judge found:
In the early morning hours of May 11, 1979, Rebecca Kunash was asleep in her bed. A nightlight had been left on in her room and her parents were asleep in another part of the house. The Defendant went to her window and saw Rebecca asleep. He forcibly removed the screen, opened the window, and climbed into her bedroom. He put his hand over her mouth, took her to his car and proceeded to an area near the Girard Street Canal on Merritt Island. He raped Rebecca, severely bruising and lacerating her vaginal area, using such force that he bruised his penis. In the course of events, he lifted Rebecca by her legs, brought her back over his head, and swung her like a sledge hammer onto the ground fracturing her skull and causing extensive damage to her brain. While she was still alive, Defendant took her into the canal and held her head under the water until she drowned. At the *176 time of her death, Rebecca Kunash was six (6) years of age.
The judge determined the following aggravating circumstances:
1. The murder was committed by appellant while he was engaged in the commission of, or flight after committing, the crimes of burglary, kidnapping and rape.
2. The murder was especially heinous, atrocious or cruel.
3. The murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification.
The record fully supports all three findings.
The court also committed no error in finding the absence of any statutory or nonstatutory mitigating circumstances. While there was conflicting evidence concerning whether the murder was committed while appellant was under the influence of extreme mental or emotional disturbance, the court was justified in concluding that this statutory mitigating circumstance was not present. Likewise, the record supports the conclusion that appellant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired. The fact that appellant had been drinking to some extent when the crime was committed does not detract from that finding. The court properly pointed out that while appellant was only twenty years of age, he was an adult of above average intelligence who had accepted the obligations of adulthood by his service in the Marines. Finally, appellant has failed to demonstrate error with respect to his contention that the court was obligated to make findings of nonstatutory mitigating circumstances.

Other points on appeal
We reject, without comment, appellant's remaining points on appeal which are listed below:
IV  Failure to suppress items seized as a result of warrantless arrest
VI  Prosecutor's comment during voir dire alleged to refer to the failure of appellant to testify
VII  Permitting admission into evidence of letter written by appellant
VIII  Failure to modify standard jury instruction
X  Overruling objection to argument of the prosecutor at penalty phase
XIII  Refusal to give appellant's requested jury instruction at the penalty phase
XVI  The Florida Capital Sentencing Statute is unconstitutional on its face and as applied.

Conclusion
We affirm appellant's convictions and we affirm the sentence of death for murder and the sentence of life imprisonment for burglary. We reverse appellant's sentences for kidnapping and sexual battery.
It is so ordered.
McDONALD, C.J., and OVERTON, EHRLICH, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] This was his third trial regarding the killing. On appeal from his first trial, this Court vacated his sentence and remanded for a new trial. Jennings v. State, 413 So.2d 24 (Fla. 1982). On retrial he was again convicted and sentenced to death, and this Court affirmed both the conviction and sentence. Jennings v. State, 453 So.2d 1109 (Fla. 1984). On petition for certiorari, however, the United States Supreme Court ordered the vacation of Jennings' sentence and a remand for new trial, Jennings v. Florida, 470 U.S. 1002, 105 S.Ct. 1351, 84 L.Ed.2d 374 (1985), which this Court did. Jennings v. State, 473 So.2d 204 (Fla. 1985).
[2] See United States v. Scalf, 708 F.2d 1540 (10th Cir.1983).
[3] Appellant was not sentenced for the two convictions of felony murder.