[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-12555

_____

BRYAN FREDRICK JENNINGS,

                                        Petitioner-Appellant,

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

                                        Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:18-cv-00281-RH-MJF

_____

Before WILSON, JILL PRYOR, and LAGOA, Circuit Judges.

PER CURIAM:

Bryan Jennings appeals the district court's order dismissing his second-in-time § 2254 petition, which includes *Brady* and *Giglio* claims, for lack of subject-matter jurisdiction. After carefully considering the parties' arguments and with the benefit of oral argument, we affirm the district court's dismissal.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case arises from Jennings's murder and sexual battery of six-year-old Rebecca Kunash. The Florida Supreme Court, quoting the trial court's sentencing order, described the relevant facts as follows:

> In the early morning hours of May 11, 1979, Rebecca Kunash was asleep in her bed. A nightlight had been left on in her room and her parents were asleep in another part of the house. [Jennings] went to her window and saw Rebecca asleep. He forcibly removed the screen, opened the window, and climbed into her bedroom. He put his hand over her mouth, took her to his car and proceeded to an area near the Girard Street Canal on Merritt Island. He raped Rebecca, severely bruising and lacerating her vaginal area, using such force that he bruised his penis. In the course of events, he lifted Rebecca by her legs, brought her back over his head, and swung her like a sledge hammer onto the ground fracturing her skull and causing extensive damage to her brain. While she was still alive, [Jennings] took her into the canal and held her head under the water until she drowned.

*Jennings v. State* (*Jennings I*), 512 So. 2d 169, 175 (Fla. 1987), *cert. denied*, 484 U.S. 1079 (1988).

A jury found Jennings guilty of, among other things, first-degree murder. *Id.* at 171.[1] At the conclusion of the penalty phase, eleven out of twelve jurors recommended a sentence of death. *Id.* at 173. The trial court agreed with this recommendation and sentenced Jennings to death. *Id.* at 171.

Jennings challenged this conviction and sentence on direct appeal, but the Florida Supreme Court affirmed both. *See id.* at 176. Jennings also was unsuccessful in an initial round of state postconviction proceedings. *See Jennings v. State* (*Jennings II*), 583 So. 2d 316 (Fla. 1991); *Jennings v. State* (*Jennings III*), 782 So. 2d 853 (Fla. 2001), *cert. denied*, 534 U.S. 1096 (2002).[2]

Jennings filed his first § 2254 petition in federal court in July 2002. The district court denied the petition, *see Jennings v. Crosby* (*Jennings IV*), 392 F. Supp. 2d 1312 (N.D. Fla. 2005), and we

---

[1] This verdict came after Jennings's third trial. *See Jennings I*, 512 So. 2d at 171 n.1. For issues unrelated to this appeal, Jennings's convictions and sentences after his first and second trial were vacated. *See id.* After the third trial, the jury also found Jennings guilty of "two counts of first-degree felony murder, kidnapping with intent to commit sexual battery, sexual battery, and burglary." *Id.* at 171. The trial court did not sentence him for the two counts of felony murder, *see id.* at 175 n.3, and it sentenced him to life imprisonment for the burglary count, *see id.* at 176. The trial court also sentenced Jennings on the kidnapping and sexual battery counts, but those sentences were vacated on direct appeal for issues irrelevant here. *Id.* at 175–76.

[2] Jennings filed another habeas petition in state court in the wake of *Ring v. Arizona*, 536 U.S. 584 (2002). It was denied.

affirmed, *see Jennings v. McDonough* (*Jennings V*), 490 F.3d 1230 (11th Cir. 2007), *cert. denied*, 552 U.S. 1298 (2008).

Jennings returned to state court and litigated three more postconviction motions filed under Florida Rule of Criminal Procedure 3.851. The Florida state courts denied relief on all three. *See Jennings v. State* (*Jennings VI*), 91 So. 3d 132, 2012 WL 1970263 (Fla. 2012) (unpublished table decision), *cert. denied*, 568 U.S. 1100 (2013); *Jennings v. State* (*Jennings VII*), 192 So. 3d 38, 2015 WL 5093598 (Fla. 2015) (unpublished table decision), *cert. denied*, 580 U.S. 857 (2016); *Jennings v. State* (*Jennings VIII*), 265 So. 3d 460 (Fla. 2018), *cert. denied*, 139 S. Ct. 2019 (2019).

In the second of the three motions, Jennings included *Brady*[3] and *Giglio*[4] claims, which were related to alleged prosecutorial misconduct. Jennings's claims were based in part on an affidavit from Clarence Muszynski, a cellmate of Jennings's who testified against him. *See Jennings I*, 512 So. 2d at 172. In his affidavit, Muszynski said that—in exchange for favorable treatment from the State for both Muszynski and his then-wife in their respective criminal cases—he collected information from Jennings and then testified against him. This contradicted Muszynski's testimony during Jennings's third trial, which was that he asked for no benefit in exchange for his testimony and that the State did not approach him to act as an agent to obtain Jennings's statements. Jennings also

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

[4] *Giglio v. United States*, 405 U.S. 150 (1972).

relied on other evidence in making his arguments—including Muszynski's Presentence Investigation Report, which reflected that Muszynski was still facing the death penalty when he testified; the case file from Muszynski's then-wife's case; and statements from Muszynski about receiving conjugal visits while incarcerated. After holding an evidentiary hearing, the state trial court did not credit Muszynski's recantation and concluded that the State did not suppress any favorable information and did not knowingly present false information. The trial court also concluded that Jennings failed to demonstrate materiality with respect to his *Brady* claims. Thus, it denied relief, and, as a mentioned above, the Florida Supreme Court affirmed. *See Jennings VII*, 2015 WL 5093598, at *2.

Jennings returned to federal court in December 2018, filing the instant § 2254 petition. He included the *Brady* and *Giglio* claims, and he argued that this petition was not second or successive under *Panetti v. Quarterman*, 551 U.S. 930 (2007). He also sought, in the alternative, relief under Federal Rule of Civil Procedure 60(b) from the district court's judgment denying his first § 2254 petition based on his new *Brady* and *Giglio* claims.

The district court concluded that the law of the circuit required the dismissal of Jennings's petition for lack of subject-matter jurisdiction. *See Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1259–60 (11th Cir. 2009) (per curiam). It also denied Jennings's Rule 60(b) motion and denied a certificate of appealability. The district court later denied Jennings's motion to alter or amend this new judgment.

Jennings then moved in this Court for a certificate of appealability. We denied it with respect to the *Brady* and *Giglio* claims raised in his Rule 60(b) motion, but concluded that, under the law of the circuit, Jennings did not need a certificate of appealability to appeal the district court's dismissal of his § 2254 petition for lack of subject-matter jurisdiction. *See Hubbard v. Campbell*, 379 F.3d 1245, 1247 (11th Cir. 2004).

## II.    STANDARD OF REVIEW

This Court reviews "*de novo* whether a petition for a writ of habeas corpus is second or successive." *Patterson v. Sec'y, Fla. Dep't of Corr.*, 849 F.3d 1321, 1324 (11th Cir. 2017) (en banc).

## III.    ANALYSIS

Before filing a second or successive § 2254 petition in the district court, a state prisoner must "move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). Without this authorization, a district court "lack[s] subject matter jurisdiction to consider the [second or] successive petition." *Williams v. Chatman*, 510 F.3d 1290, 1295 (11th Cir. 2007) (per curiam).

Because Jennings did not move in this Court for an order authorizing consideration of his second-in-time § 2254 petition before he filed it in the district court, we must decide whether his petition is second or successive for the purposes of § 2244(b). If it is, then the district court correctly dismissed the petition for a lack of subject-matter jurisdiction. If it is not, then the district court erred.

In answering this question, we are not "writing on a clean slate." *Scott v. United States*, 890 F.3d 1239, 1243 (11th Cir. 2018). Indeed, "our Circuit has already written all over this slate." *Id.* And the answer is clear: a second-in-time § 2254 petition raising *Brady* and *Giglio* claims is a second or successive petition subject to § 2244(b)'s restrictions. As the district court recognized, we decided this issue in *Tompkins*, 557 F.3d at 1260. There, as here, the petitioner relied heavily on *Panetti*. *Id.* at 1259. *Panetti* concerned the applicability of § 2244(b) to a second-in-time § 2254 petition that included a *Ford*[5] claim. 551 U.S. at 941–42. In *Ford*, the Supreme Court held that "the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." 477 U.S. at 409–10. The *Panetti* Court concluded that "[t]he statutory bar on 'second or successive' applications does not apply to a *Ford* claim brought in an application filed when the claim is first ripe." 551 U.S. at 947. To reach that conclusion, the Supreme Court considered, among other things, its decisions predating the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA)—including cases applying the abuse-of-the-writ doctrine[6]—the implications for habeas practice, and AEDPA's

---

[5] *Ford v. Wainwright*, 477 U.S. 399 (1986).

[6] Before the enactment of AEDPA, a state prisoner could not raise a new claim in a second-in-time habeas petition if doing so constituted "an abuse of the writ." *McCleskey v. Zant*, 499 U.S. 467, 479 (1991); *see id.* at 479–89 (explaining the evolution of the abuse-of-the-writ doctrine). Back then, the relevant statutory provision provided that once a state prisoner's petition for a writ of habeas corpus was denied by a federal court after an evidentiary hearing on a

purposes, which include furthering the principles of comity, finality, and federalism. *Id.* at 943–47.

In *Tompkins*, we stated that the "*Panetti* case involved only a *Ford* claim, and the Court was careful to limit its holding to *Ford* claims." 557 F.3d at 1259. This is because, we said, "a *Ford* claim is different from most other types of habeas claims." *Id.* To explain this difference, we had to further define ripeness as the *Panetti* Court used it. In doing so, we rejected the argument that a *Brady* or *Giglio* claim was not "ripe" until the evidence underlying the claim is discovered. *Id.* at 1260. Instead, we said, the alleged constitutional violations at issue in *Brady* and *Giglio* claims "occur, if at

---

material factual issue or a hearing on the merits of a legal issue, "a subsequent application for a writ of habeas corpus in behalf of such person need not be entertained by a court of the United States or a justice or judge of the United States unless the application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ." 28 U.S.C. § 2244(b) (1995). Federal courts found an abuse of the writ, for example, when an applicant failed to include a claim in his first petition through deliberate abandonment or inexcusable neglect. *See McCleskey*, 499 U.S. at 489. The pre-AEDPA scheme was more forgiving than the one now enshrined in § 2244(b)(2). For instance, federal courts could consider a claim raised in a second-in-time petition if a state prisoner could demonstrate cause for failing to raise the claim in a prior proceeding and prejudice resulting from the error of which he complained. *Id.* at 494. If a prisoner could not show cause, a federal court could still entertain his claim if he could show that his case was among a "class of cases . . . implicating a fundamental miscarriage of justice," such as "when a constitutional violation probably has caused the conviction of one innocent of the crime." *Id.* at 494.

all, at trial or sentencing and are ripe for inclusion in a first petition." *Id.* "Mental competency to be executed," on the other hand, "is measured at the time of execution, not years before then." *Id.* at 1260. "A claim that a death row inmate is not mentally competent means nothing unless the time for execution is drawing nigh," and it "is not ripe years before the time of execution because mental conditions of prisoners vary over time." *Id.* Thus, we concluded, the reason a *Ford* claim is not typically ripe when a state prisoner files his first petition is *not* "that evidence of an existing or past fact had not been uncovered at that time," but instead because "the facts to be measured or proven—the mental state of the petitioner at the time of execution—do not and cannot exist when the execution is years away." *Id.*

Therefore, because Tompkins's *Brady* and *Giglio* claims were "ripe" at the time he filed his first § 2254 petition, this Court in *Tompkins* concluded that the reasoning of *Panetti* did not extend to these claims and that the second-in-time petition at issue raising these claims was second or successive. *Id.*

Under this Circuit's prior-panel-precedent rule, *Tompkins*'s holding "is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008). For a Supreme Court decision to undermine panel precedent to the point of abrogation, the "decision must be clearly on point" and "*clearly contrary*" to the panel precedent. *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d

1288, 1292 (11th Cir. 2003) (emphasis in original) (quoting *NLRB v. Datapoint Corp.*, 642 F.2d 123, 129 (5th Cir. Unit A Apr. 1981)). If, for example, "the Supreme Court 'never discussed' our precedent and did not 'otherwise comment[] on' the precise issue before the prior panel, our precedent remains binding." *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (alteration in the original) (quoting *United States v. Vega-Castillo*, 540 F.3d 1235, 1238 (11th Cir. 2008)). "To abrogate a prior-panel precedent, 'the later Supreme Court decision must "demolish" and "eviscerate" each of its "fundamental props."'" *Dubois*, 94 F.4th at 1293 (quoting *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022)). An intervening decision of the Supreme Court, or this Court *en banc*, that "merely weaken[s]" the holding of an earlier panel is not sufficient to abrogate that holding. *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009).

Jennings relies on the Supreme Court's decision in *Banister v. Davis*, 590 U.S. 504 (2020), to argue that *Tompkins* has been abrogated. The question in *Banister* was whether a motion filed under Federal Rule of Civil Procedure 59(e) constituted a second or successive § 2254 petition for the purposes of § 2244(b). *See id.* at 511. To answer the question, the Supreme Court, in line with *Panetti*, consulted both "historical habeas doctrine and practice" and "AEDPA's own purposes." *Id.* at 512. As for the former consideration, the Court said that if a later-in-time filing would have constituted an abuse of the writ before the enactment of AEDPA, it likely would constitute a second or successive § 2254 petition now. *Id.* But, on the other hand, if it would not have been considered an

abuse of the writ in the pre-AEDPA days, a later-in-time filing likely would not be considered a second or successive petition now. *Id.*

The Court concluded that both history and purpose cut in favor of deciding that a Rule 59(e) motion is not a second or successive § 2254 petition. *Id.* at 512–17. As for the history, the Court pointed to its pre-AEDPA decision in *Browder v. Director, Department of Corrections of Illinois*, 434 U.S. 257 (1978), where it determined that Rule 59(e) applied in habeas proceedings. *Id.* at 270–71; *see Banister*, 590 U.S. at 513–14 (discussing *Browder*). It also noted that in the half-century from the adoption of Rule 59(e) to the enactment of AEDPA, only one court dismissed a Rule 59(e) motion because it was successive and an abuse of the writ. *Banister*, 590 U.S. at 514–15. And nothing in AEDPA, the Court concluded, provided an "indication that Congress meant to change the historical practice *Browder* endorsed of applying Rule 59(e) in habeas proceedings." *Id.* at 515.

Turning to AEDPA's purposes, the Court determined that allowing petitioners to file Rule 59(e) motions would further them. For one, such motions "may make habeas proceedings more efficient" by enabling district courts to reverse mistaken judgments, "and so make an appeal altogether unnecessary." *Id.* at 516. The Court also noted the fact that a party can file a Rule 59(e) motion for only twenty-eight days following entry of judgment. *Id.* And it emphasized that movants cannot raise new arguments or evidence under Rule 59(e) that they could have raised before judgment was entered, thereby incentivizing a prisoner "to consolidate all of his

claims in his initial application." *Id*. Finally, the Court stated that "the costs of permitting a Rule 59(e) motion are typically slight" given that a judge familiar with the case "can usually make quick work of a meritless motion." *Id*. at 517. The upshot, according to the Court, "is that Rule 59(e) motions are not second or successive petitions, but instead a part of a prisoner's first habeas proceeding." *Id*. They do not "enable a prisoner to abuse the habeas process by stringing out his claims over the years," but "instead give[] the court a brief chance to fix mistakes before its (single) judgment on a (single) habeas application becomes final." *Id*.

*Banister* then distinguished Rule 59(e) motions from Rule 60(b) motions, *id*. at 518–21, which are treated as second or successive petitions if, among other things, they "attack[] the federal court's previous resolution of a claim on the merits," *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005) (emphasis omitted). Unlike Rule 59(e) motions, Rule 60(b) motions serve "to collaterally attack [an] already completed judgment," and "threaten[] an already final judgment with successive litigation." *Banister*, 590 U.S. at 518–19. The Court explained that the distinction between Rule 59(e) and Rule 60(b) "was not lost on pre-AEDPA habeas courts applying the two rules." *Id*. at 519. Unlike Rule 59(e), a multitude of pre-AEDPA cases exist in which the court dismissed a Rule 60(b) motion for bringing repetitive claims. *Id*. In addition, the Court pointed out that "Rule 60(b) motions can arise long after the denial of a prisoner's initial petition," and that the denial of such motions, unlike the denial of Rule 59(e) motions, gives rise to a separate appeal. *Id*. at 519–20. In contrast to a Rule 60(b) motion, "a Rule

20-12555                Opinion of the Court                13

59(e) motion is a one-time effort to bring alleged errors in a just-issued decision to a habeas court's attention, before taking a single appeal." *Id.* at 521.  For all these reasons, *Banister* held that a Rule 59(e) motion was not subject to § 2244(b)'s restrictions.

On appeal, Jennings argues that *Banister* abrogated *Tompkins*.  We disagree.  We conclude that *Banister* did not abrogate *Tompkins*, and that we are bound by that decision here.  "Even if the reasoning of an intervening high court decision is at odds with a prior appellate court decision, that does not provide the appellate court with a basis for departing from its prior decision." *Vega-Castillo*, 540 F.3d at 1237.  *Banister* applied its methodology in the context of "resolv[ing] a Circuit split about whether a Rule 59(e) motion to alter or amend a habeas court's judgment counts as a second or successive habeas application." 590 U.S. at 511.  In *Banister*, the Supreme Court had no occasion to pass on the question we answered in *Tompkins*, and no occasion to disagree with the answer we provided.  Thus, it cannot be said that *Banister* abrogated *Tompkins*.  *See Dubois*, 94 F.4th at 1293 ("If the Supreme Court 'never discussed' our precedent and did not 'otherwise comment[] on' the precise issue before the prior panel, our precedent remains binding." (alteration in original) (quoting *Vega-Castillo*, 540 F.3d at 1238)).

In addition, there are also important differences between a second-in-time § 2254 petition and a Rule 59(e) motion that limit the applicability of *Banister* here.  For example, "[i]n timing and substance, a Rule 59(e) motion hews closely to the initial application"

14                    Opinion of the Court                    20-12555

and "[s]uch a motion does not enable a prisoner to abuse the habeas process by stringing out his claims over the years." *Banister*, 590 U.S. at 517. As discussed, a movant has only twenty-eight days after entry of judgment to file a motion to alter or amend the judgment under Rule 59(e) and he cannot raise any new issues that could have been raised before judgment was entered. *See id.* at 516. A second-in-time § 2254 petition, however, is often not so closely tied to the initial petition. For example, while the district court in *Banister* adjudicated the petitioner's Rule 59(e) motion in five days, *id.* at 517, Jennings filed the instant petition, which raised new issues, over ten years after his first round of collateral litigation in federal court ended.

For all these reasons, we conclude that we remain bound by *Tompkins* and that Jennings's second-in-time § 2254 petition is second or successive.[7] Because Jennings failed to obtain from this Court an order authorizing the district court to consider his petition, *see* 28 U.S.C. § 2244(b)(3)(A), the district court was correct to dismiss it for lack of subject-matter jurisdiction. *See Williams*, 510 F.3d at 1295.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of Jennings's second or successive § 2254 petition for lack of subject-matter jurisdiction.

---

[7] Jennings does not argue that his case meets one of the exceptions set out in § 2244(b)(2).

20-12555                Opinion of the Court                15

**AFFIRMED.**

20-12555             JILL PRYOR, J., Concurring                    1

JILL PRYOR, Circuit Judge, joined by WILSON, Circuit Judge, Concurring:

I concur in the majority opinion because I agree that we are bound to follow *Tompkins v. Secretary, Department of Corrections*, 557 F.3d 1257 (11th Cir. 2009), which dictates that Mr. Jennings's current § 2254 petition is second or successive. If not for our prior panel precedent rule, I would reach a different result. I would conclude that a habeas petition alleging an actionable *Brady* violation that the petitioner, in exercising due diligence, could not have been expected to discover in the absence of the government's disclosure, is not a "second or successive" petition within the meaning of 28 U.S.C. § 2244(b). In my view, *Tompkins* was wrongly decided, as explained in Judge Rosenbaum's opinion in *Scott v. United States*, which I joined. 890 F.3d 1239, 1249–54 (11th Cir. 2018). But *Tompkins* is the law of this Circuit, and I am bound by it here.