[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-16363

_____

D. C. Docket No. 02-00174 CV-RH

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 3, 2007
THOMAS K. KAHN
CLERK

BRYAN F. JENNINGS,

Petitioner-Appellant,
Cross-Appellee,

versus

JAMES MCDONOUGH, Secretary,
Florida Department of Corrections,
BILL MCCOLLUM,
Attorney General for the State of Florida,

Respondents-Appellees,
Cross-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

(July 3, 2007)

Before TJOFLAT, ANDERSON and MARCUS, Circuit Judges.

ANDERSON, Circuit Judge:

Bryan F. Jennings, a Florida prisoner sentenced to death for the 1979 murder of Rebecca Kunash, appeals the district court's denial of his petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. After denying the writ, the district court granted a certificate of appealability on Jennings's claim that his sentence was rendered unconstitutional by the application of two invalid aggravating factors—that the murder was "heinous, atrocious, and cruel" (HAC) and "cold, calculated, and premeditated" (CCP). We expanded the certificate of appealability to include Jennings's claims that the prosecution withheld evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), and that he received ineffective assistance of counsel during the penalty phase of his trial. For the reasons discussed below, we conclude that Jennings is not entitled to relief and affirm the district court's denial of his habeas petition.

## I. BACKGROUND

On the night of May 10, 1979, Bryan Jennings, on leave from the Marines, met his friends at a local bar. Sometime that evening, he stopped at the house of Rebecca Kunash and secretly looked in her bedroom window while she lay sleeping. After drinking with his friends at one and then a second bar, Jennings returned to the Kunash house. What happened next was later described by the trial judge and quoted by the Florida Supreme Court as follows:

In the early morning hours of May 11, 1979, Rebecca Kunash was asleep in her bed. A nightlight had been left on in her room and her parents were asleep in another part of the house. The Defendant went to her window and saw Rebecca asleep. He forcibly removed the screen, opened the window, and climbed into her bedroom. He put his hand over her mouth, took her to his car and proceeded to an area near the Girard Street Canal on Merritt Island. He raped Rebecca, severely bruising and lacerating her vaginal area, using such force that he bruised his penis. In the course of events, he lifted Rebecca by her legs, brought her back over his head, and swung her like a sledge hammer onto the ground fracturing her skull and causing extensive damage to her brain. While she was still alive, Defendant took her into the canal and held her head under the water until she drowned. At the time of her death, Rebecca Kunash was six (6) years of age.

Jennings v. State, 512 So. 2d 169, 175-76 (Fla. 1987) (per curiam) ("Jennings III").

Jennings was arrested and, following two overturned trials,[1] convicted of first-degree murder, kidnapping, sexual battery, and burglary on March 28, 1986. At his third trial, the State introduced the testimony of Clarence Muszynski, Allen Kruger, and Billy Crisco, who each heard Jennings confess to the crime while incarcerated with him. Muszynski's testimony in particular provided graphic details of the crime, including how Jennings choked Rebecca unconscious as he took her from

---

[1] The Florida Supreme Court vacated Jennings's first conviction and death sentence on direct appeal and remanded for a new trial. Jennings v. State, 413 So. 2d 24, 25-26 (Fla. 1982) ("Jennings I"). After the second trial, the Florida Supreme Court affirmed the conviction and death sentence, rejecting Jennings's argument that evidence of a confession he gave was introduced at trial in violation of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880 (1981). Jennings v. State, 453 So. 2d 1109, 1111 (Fla. 1984) ("Jennings II"). The United States Supreme Court disagreed, however, and vacated the judgment of conviction based on Jennings's confession. Jennings v. Florida, 470 U.S. 1002, 105 S.Ct. 1351 (1985) (mem.).

her bed and dropped her from the bedroom window to the grass below. Also according to Muszynski's testimony, Rebecca regained consciousness during the course of the rape, and Jennings swung her head into the curb to prevent her from crying out and attracting attention. Jennings v. State, 782 So. 2d 853, 862-63 (Fla. 2001) (per curiam) ("Jennings V").[2]

Following his conviction, Jennings's trial entered the penalty-phase component of a bifurcated proceeding before the same judge and jury, as provided by Florida law. Fla. Stat. § 921.141(1). In the penalty phase, the jury returns an advisory sentence based on the State's presentation of statutory aggravating circumstances and the defendant's evidence of any relevant mitigating circumstances. The jury's recommendation need not be unanimous, nor need the jury reveal what aggravators or mitigators it has considered. Fla. Stat. § 921.141(2). The trial judge may accept or reject the jury's recommendation, but if the judge decides to impose the death penalty, the judge must independently weigh the factors and provide a written statement showing "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances." Fla. Stat. §

---

[2] In addition to the testimony of Muszynski, Kruger, and Crisco, the conviction was supported by evidence of Jennings's fingerprints on the bedroom window, a shoe print matching his shoes found in a nearby field, a letter he wrote to Muszynski referring to his confession to Kruger, testimony that his clothes were wet from the canal, and evidence of abrasions to his penis from the rape. Jennings V, 782 So. 2d at 856 n.4.

4

921.141(3)(b).  Otherwise, the judge is directed to enter a sentence of life imprisonment.  See Fla. Stat. § 775.082.

At the penalty phase of Jennings's trial, the judge instructed the jury that it could consider any of the following aggravators supported by evidence admitted in the guilt phase:

> 1. That the crime for which Bryan Frederick Jennings is to be sentenced was committed while the defendant was engaged in the commission of or an attempt to commit sexual battery, burglary, or kidnapping.
> 2. That the crime for which the defendant is to be sentenced was especially wicked, evil, atrocious, or cruel. ["HAC"][3]
> 3. That the crime for which the defendant is to be sentenced was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. ["CCP"]

See Fla. Stat. § 921.141(5)(d), (h), (i).

Jennings's attorney sought to establish three statutory mitigating circumstances to weigh against these aggravators: (1) that Jennings was "under the influence of extreme mental or emotional disturbance," (2) that Jennings's ability to "appreciate the criminality of his . . . conduct or to conform his . . . conduct to the requirements of law was substantially impaired," and (3) that Jennings's "age . . . at the time of the crime" extenuated the offense (he was 20).  See Fla. Stat. §

---

[3] We continue the practice of referring to the "especially wicked, evil, atrocious, or cruel" aggravator as "HAC," short for "heinous, atrocious, and cruel," the formulation used by most states.

921.141(6)(b), (f), (g).[4]   To support the mitigating circumstance that Jennings

suffered from an extreme mental or emotional disturbance, his attorney introduced

the testimony of two mental health experts who diagnosed Jennings with having

passive aggressive, impulsive, and antisocial personality disorders.  Jennings's

attorney attempted to establish Jennings's substantial impairment with proof that he

was intoxicated at the time of the murder.[5]   Two witnesses—Russell Schneider and

Catherine Music, Jennings's aunt—testified at the penalty phase concerning

Jennings's intoxication.  Schneider was at a bar with Jennings in the hours leading

up to the murder and estimated that Jennings drank the equivalent of one-and-a-

half pitchers of beer.  Catherine Music testified that Jennings, who was staying

with her while he was on leave from the Marines, returned home at 5:00 a.m. on the

morning following the murder, staggered, fell against the wall, and said, "Oh I'm

so drunk."

The State presented two mental health experts of its own to rebut Jennings's

mitigation evidence.  Both experts diagnosed Jennings with having personality or

---

[4] Jennings's attorney also introduced evidence to support at least two nonstatutory mitigating factors.  First, he argued that Jennings's upbringing, including his lack of a father figure and constant relocations, contributed to his personality disorders and impulsive behavior. Second, he argued that the close relationship Jennings established with the family of a high-school friend showed that he was not completely antisocial and could be rehabilitated.

[5] Florida courts recognize intoxication as a possible means of proving the "substantial impairment" mitigating factor.  Buford v. State, 570 So. 2d 923, 925 (Fla. 1990).

6

antisocial disorders, but neither believed that he was suffering under an extreme mental or emotional disturbance or that he could not conform his conduct to the law at the time of the offense. Jennings told one of the experts that he had taken two hits of LSD on the night of the murder. Despite agreeing on cross-examination that alcohol and LSD could worsen the symptoms of Jennings's psychological disorders, the expert did not believe that Jennings's perceptions were distorted. The other expert testified hypothetically that alcohol and LSD could impair judgment and exacerbate the impulsive behavior of someone with a personality disorder, but he did not believe Jennings's actions demonstrated substantial impairment on the facts of the case. Both experts testified that Jennings's ability to function in planning and executing the murder showed that he was not substantially impaired.

Eleven of the twelve jurors voted to return an advisory recommendation in favor of death, and the trial judge sentenced Jennings to death for the first-degree murder charge. As required by statute, the trial judge entered specific findings of fact to support his conclusion that the statutory aggravating factors outweighed the mitigating factors. He found the presence of all three statutory aggravators and no mitigating circumstances. The Florida Supreme Court affirmed the conviction and

death sentence on direct appeal. Jennings III, 512 So. 2d at 176.[6]

On October 23, 1989, Jennings moved for postconviction relief in state court under Florida Rule of Criminal Procedure 3.850. The motion included a Brady claim premised on an undisclosed taped statement by Judy Slocum further describing Jennings's intoxication on the night of the murder. Slocum said that she drove Jennings from the bar to his home at around midnight so that he could change his pants because his zipper was broken. Jennings v. State, 583 So. 2d 316, 318 (Fla. 1991) (per curiam) ("Jennings IV"). Jennings raised a second Brady claim based on a letter Clarence Muszynski wrote to the prosecutor requesting the appointment of an attorney. Id. at 322. Jennings's Rule 3.850 motion also asserted an ineffective assistance claim for his trial counsel's failure to investigate and present additional evidence of his intoxication from Annis Music (Catherine's

---

[6] Regarding Jennings's evidence of mitigating circumstances, the court concluded:
While there was conflicting evidence concerning whether the murder was committed while appellant was under the influence of extreme mental or emotional disturbance, the court was justified in concluding that this statutory mitigating circumstance was not present. Likewise, the record supports the conclusion that appellant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired. The fact that appellant had been drinking to some extent when the crime was committed does not detract from that finding. The court properly pointed out that while appellant was only twenty years of age, he was an adult of above average intelligence who had accepted the obligations of adulthood by his service in the Marines.
Jennings III, 512 So. 2d at 176.

daughter), who saw Jennings return home on the morning of the murder, and Patrick Clawson and Floyd Canada, who had been drinking with Jennings earlier in the night. The court rejected Jennings's <u>Brady</u> and ineffective assistance claims, and the Florida Supreme Court affirmed. <u>Id.</u> at 318-20. The court also decided the merits of Jennings's argument that instructing the jury on the CCP aggravator—which became effective on July 5, 1979, two months after the murder—violated the Ex Post Facto Clause. The court found that two state supreme court decisions had already rejected the argument. <u>Id.</u> at 321 (citing <u>Zeigler v. State</u>, 580 So. 2d 127 (Fla. 1991); <u>Combs v. State</u>, 403 So. 2d 418 (Fla. 1981), <u>cert. denied</u>, 456 U.S. 984, 102 S.Ct. 2258 (1982)).

Although the Florida Supreme Court affirmed the denial of his postconviction motion, it granted Jennings additional time to obtain and review portions of the State's files under Florida's Public Records Act. <u>Id.</u> at 319. Following that review, Jennings refiled for postconviction relief, and the trial court held an evidentiary hearing in 1997 to receive testimony on the <u>Brady</u> and ineffective assistance claims. On appeal, however, the Florida Supreme Court ruled that the claims involving the Slocum tape, the Muszynski letter, Annis Music, Clawson, and Canada were procedurally barred because they had previously been adjudicated by the <u>Jennings IV</u> court. <u>Jennings V</u>, 782 So. 2d at 858, 859-60 &

9

n.8.  The court did address the merits of Jennings's new Brady claim based on the notes of state assistant attorney Michael Hunt taken from an interview with Allen Kruger and uncovered during the public records search.  The Florida Supreme Court held that four different notations made by Hunt alleged to constitute Brady material were either not exculpatory or not material.  Id. at 856-58.  Finally, the court considered Jennings's argument that the HAC aggravator was unconstitutionally vague without a proper limiting instruction.  The court ruled that the error of giving the vague HAC instruction was harmless because the facts of the murder supported the aggravator under the proper instruction.  Id. at 862-63.

Jennings then petitioned for a writ of habeas corpus in the United States District Court for the Northern District of Florida.  The district court denied the petition.  On appeal, Jennings maintains that the district court erred in ruling (1) that the asserted Brady evidence was not material or exculpatory; (2) that the penalty-phase ineffectiveness claim did not meet the Strickland standard; (3) that application of the vague HAC instruction was harmless error;  and (4) that the instruction given on the ex post facto CCP aggravator was harmless error.  The State of Florida has filed a cross appeal challenging the district court's determination that the retroactively applied CCP aggravator violated the Ex Post Facto Clause.

## II. STANDARD OF REVIEW

Because Jennings filed his federal petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, AEDPA's provisions apply. Accordingly, we may grant habeas relief only where the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's factual findings are presumed correct unless rebutted by the petitioner with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to" clearly established law if the court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or the state court confronted facts that are "materially indistinguishable" from relevant Supreme Court precedent but arrived at a different result. Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 1519 (2000). A state court decision is an "unreasonable application" of clearly established law if the state court unreasonably extends or fails to extend a clearly established legal principle to a new context. Id. at 407, 120 S.Ct. at 1520. An application of federal law cannot be considered unreasonable merely because it is, in our judgment, incorrect or

11

erroneous; a state court decision must also be unreasonable.  Id. at 410-11, 120

S.Ct. at 1522.  Questions of law and mixed questions of law and fact are reviewed

de novo, as is the district court's conclusion regarding the reasonableness of the

state court's application of federal law.  LeCroy v. Sec'y, Fla. Dep't. of Corr., 421

F.3d 1237, 1259 (11th Cir. 2005).

### III.  DISCUSSION

#### A. The Brady Claims

We first turn to Jennings's claim that he is entitled to relief from his death

sentence because the prosecution failed to disclose exculpatory or impeachment

evidence as required by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963).

Specifically, he argues that the Florida Supreme Court's treatment of the Slocum

tape, the prosecutor's notes from the Kruger interview, and the Muszynski letter

was an unreasonable application of clearly established law.  We disagree.

#### 1.  The Applicable Law

At the time of the Florida Supreme Court's review of Jennings's Brady

claims, it was well established that "the suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment, irrespective of the good faith or bad faith

of the prosecution."  Id. at 87, 83 S.Ct. at 1196-97.  Evidence "favorable to an

accused" includes both impeachment evidence and exculpatory evidence.  United

States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380 (1985).  In Bagley, the

Court emphasized that only the suppression of material evidence justifies a new

trial or resentencing under Brady, with materiality being defined as evidence

creating "a reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different.  A 'reasonable

probability' is a probability sufficient to undermine confidence in the outcome."

Id. at 682, 105 S.Ct. at 3383.

The Court elaborated on the Bagley materiality standard in the case of Kyles

v. Whitley, 514 U.S. 419, 115 S.Ct. 1555 (1995),[7] identifying four important

aspects of the standard.  First, the Court emphasized that

> a showing of materiality does not require demonstration by a
> preponderance that disclosure of the suppressed evidence would have
> resulted ultimately in the defendant's acquittal …. Bagley's
> touchstone of materiality is a "reasonable probability" of a different
> result, and the adjective is important. The question is not whether the
> defendant would more likely than not have received a different verdict
> with the evidence, but whether in its absence he received a fair trial,
> understood as a trial resulting in a verdict worthy of confidence.

Id. at 434, 115 S.Ct. at 1566 (citations omitted).  Second, "Bagley materiality . . . is

---

[7] Although decided after the Florida Supreme Court's decision in Jennings IV, Kyles did
not announce a new rule of law and therefore informs our review of the state court's Brady
analysis. Breedlove v. Moore, 279 F.3d 952, 961 n.7 (11th Cir. 2002).

not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough to convict." Id. at 434-35, 115 S.Ct. at 1566. Third,

> once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review. . . . A Bagley error could not be treated as harmless, since "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict . . . .

Id. at 435, 115 S.Ct. at 1566 (citations omitted). Fourth, materiality must be assessed in terms of the "cumulative effect" of the suppressed evidence, "not item by item." Id. at 436-37, 115 S.Ct. at 1567.

2. The Slocum Tape

In the first round of state postconviction proceedings, Jennings claimed that a taped statement by Judy Slocum was withheld from him during his trial in violation of Brady. In her statement, Slocum told police that she drove Jennings from the bar to his home on the night of the murder so that he could change his pants and then drove him back to the bar. Slocum offered to drive Jennings because she recognized that "he knew he had too much to drink" and could not drive himself. She also said that when she left the bar at 2:30 a.m., Jennings was "very much loaded." Jennings IV, 583 So. 2d at 318. The Florida Supreme Court

14

concluded that the tape did not satisfy the test for materiality because Jennings's failure to call several other witnesses who could testify about his intoxication showed that he never intended to pursue a defense of intoxication.  Id. at 318-19.

Jennings contends that the Florida Supreme Court, in reviewing his Brady claim on the Slocum tape, failed to consider the effect of the tape on the penalty phase of the trial as evidence of mitigation. Jennings points out that the United States Supreme Court in Brady held that suppressed evidence violates the constitutional rights of criminal defendants whether "the evidence is material either to guilt or to punishment."  Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97 (emphasis added).  Thus, failure to consider the taped statement's effect on the punishment imposed could be an unreasonable application of clearly established federal law. Jennings contends that the Slocum tape would have made a difference in his sentence because it provided "graphic evidence" of Jennings's substantial impairment resulting from his drinking.  In support, he cites the testimony of the State's mental health expert who testified hypothetically that Jennings could have been rendered substantially impaired from the consumption of drugs and alcohol (although the expert declined to find that Jennings was actually impaired).

Although the Florida Supreme Court focused on the effect that Slocum's statement would have had on the guilt phase of the trial, there is no question that

15

the court also considered its effect on the penalty phase as well.  The court said so explicitly.  At the outset of its discussion, the court observed, "Jennings argues that Slocum's testimony would have been material to both the guilt and penalty phases of the trial." Jennings IV, 583 So. 2d at 318 (emphasis added).  Quoting the trial court, the state supreme court understood that "[t]rial defense counsel now avers that had he known of the contents of the tape he would have used Slocum both in the guilt phase to bolster his defense of intoxication and during the penalty phase to add to his proof of the defendant's intoxication as a mitigating factor." Id. (emphasis added) .   A fair reading of the Florida Supreme Court's opinion shows that its assessment of the statement's materiality encompassed the penalty phase of Jennings's trial.

Moreover, it is clear that the Slocum tape was not suppressed for purposes of the Brady analysis.  As the Florida Supreme Court found, Jennings

> had knowledge not only of Slocum's name but also the subject matter of her knowledge about the case.  Not only was Jennings aware of her participation in the evening's events, defense was aware of the statement of Russell Schneider that Judy Slocum drove Bryan to his mother's house at about 11:30-12:00 p.m. to change his pants because his zipper was broken and that Jennings had been drinking large amounts of beer. Defense was also aware of the statement of Charles [Patrick] Clawson that Jennings had a girl drive him over to his mother's house about 10:00-11:00 p.m. because he felt he was unable to drive. . . .   The Slocum statement merely confirmed the Schneider and Clawson statements.

16

Id. at 318.

Jennings criticizes this reasoning because, as the Florida Supreme Court itself noted, the State "concede[d] that [it] violated the discovery rules by failing to disclose and produce the taped statement of Judy Slocum." Id. So, according to Jennings, the fact that he knew about the contents of Slocum's statement from other sources is irrelevant. But a violation of the discovery rules does not ipso facto amount to suppression that can support a Brady claim for a new trial or resentencing. In United States v. Griggs, 713 F.2d 672 (11th Cir. 1983) (per curiam), we adopted the rule that, "[w]here defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged Brady material, there is no suppression by the government." Id. at 674. In Griggs, a mail fraud case, we refused to recognize a Brady claim where the defendant had full knowledge of the witness who he alleged gave an exculpatory statement to the prosecution, even though the defense had made a specific request for such statements. Id. We noted that, while the better course would be for prosecutors to hand over such evidence, a new trial was not warranted for failure to do so. Id.

Jennings was plainly aware of Slocum and thus had within his knowledge information by which he could have ascertained her statement. Slocum drove Jennings home on the night of the murder, and another witness, Schneider, testified

17

to that fact. Also, as the Florida Supreme Court reasoned, Jennings not only had

knowledge of Slocum as a potential witness, he clearly was aware of the import and

tenor of the Slocum tape from other sources, including the pretrial statements of

Schneider and Clawson. Jennings IV, 583 So. 2d at 318. And, of course, nothing

prevented Jennings himself from talking to Slocum. Thus, there was no

suppression of the tape.[8] As a result, Jennings cannot show that the state court's

rejection of his Brady claim based on Slocum's taped statement was contrary to or

an unreasonable application of clearly established federal law.

3. The Assistant State Attorney's Notes from the Kruger Interview

In the second round of state postconviction proceedings, Jennings brought

forward a separate Brady claim based on newly uncovered notes that assistant state

---

[8] The United States Supreme Court's decision in Banks v. Dretke, 540 U.S. 668, 124 S.Ct. 1256 (2004), does not compel a different result. Although the Court in Banks did warn that a rule "declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process," id. at 696, 124 S.Ct. at 1275, that statement was made in response to the State's contention that the "prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence." Id.; see also id. at 694, 124 S.Ct. at 1274 (noting that the prosecution continually allowed "untruthful testimony to stand uncorrected" on the matter underlying the Brady claim). Here, however, there is no allegation that the prosecution actively misled Jennings about the existence of the tape. In Maharaj v. Sec'y for Dep't of Corr., 432 F.3d 1292 (11th Cir. 2005), we took note of this and other facts that distinguished the Banks decision and applied the Griggs rule, notwithstanding Banks, to bar a Brady claim where the defendant had "equal access" to the evidence. Id. at 1315 n.4. Likewise here, Jennings had equal access to the statement either by introducing Slocum herself, or by relying on Catherine Music, Russell Schneider, Patrick Clawson, or Floyd Canada, each of whom described Jennings's condition on the night of the murder in pretrial statements. See Jennings IV, 583 So. 2d at 318. The Constitution does not demand invalidating a sentence in such circumstances.

18

attorney Michael Hunt took during his interview with Allen Kruger, one of the three inmates who recounted Jennings's confession. Jennings identifies four separate notations from the interview that he maintains are favorable and material under Brady and that, in his view, impeach the testimony of Muszynski and Kruger, which was relied on at the penalty phase to establish the HAC and CCP aggravating factors as well as the absence of any mitigating factors.

The first notation concerns the relative order in which Muszynski and Kruger came forward to report Jennings's confession. Hunt's handwritten notation reads "(Note–W[itness Kruger] came to light after Rick [Muszynski] told BCSO [Brevard County Sheriff's Office] of his presence)." Suppression of this notation violated Brady, Jennings argued in the state court, because the trial testimony of Muszynski and others established that Kruger, not Muszynski, was the first to approach prison officials. Thus, the notation would impeach Muszynski's testimony and, as Jennings's trial counsel testified at the 1997 postconviction hearing, "would imply that Mr. Muszynski provided the details to Kruger," tying "Kruger in with Muszynski in almost a quasi-conspiracy-type theory."

The Florida Supreme Court rejected this interpretation of the notation. Quoting the trial court's determination, the court found that

Mr. Hunt's testimony at the evidentiary hearing was that this

19

was a parenthetical note to himself, not something conveyed to him by the witness. Further he testified that he was not initially involved in the investigation of the case and would have to rely upon the case reports but that "Mr. Kruger came forward voluntarily, at some point, independent of Mr. Muszinski [sic]."

. . . .

How Kruger came forward or when Kruger came forward is not favorable evidence which was suppressed or would have changed the outcome of the trial. The parenthetical note of Michael Hunt appears to be an error on the part of Mr. Hunt; it was based solely on his review of previously disclosed case reports. The fact remains that Kruger came forward voluntarily, and all of the credible testimony shows that he came forward before Muszynski.

Jennings V, 782 So. 2d at 857 (citation and footnote omitted). The court therefore found that the notation did not create a "reasonable probability that the result of the proceeding would have been different" because the notation "was made by Hunt based on case reports and not on what Kruger told him" and because Jennings had failed "to establish the relevance of who contacted the State first." Id. at 858.

Jennings deems the Florida Supreme Court's determination that the notation was not favorable evidence to be objectively unreasonable because the notation contradicts both Muszynski and Kruger, thus impeaching their testimony. Even assuming arguendo that the notation is favorable because of its impeachment value, Jennings fails to challenge the Florida Supreme Court's separate conclusion that the notation is not material because it did not create a reasonable probability of changing the outcome of sentencing. To imagine the notation changing the

20

outcome, we would have to conclude that the factfinder could reasonably determine either that the notation came directly from Kruger, in which case it would contradict Kruger's own later statement, or that the notation is true, which would render Muszynski's and Kruger's statements false. Jennings has not attempted to contest Hunt's testimony at the 1997 postconviction hearing that the notation was a "parenthetical note to himself, not something conveyed to him by" Kruger. Rather, Jennings takes the second route, challenging the trial court's conclusion that the notation was "an error on the part of Mr. Hunt . . . based solely on his review of previously disclosed case reports." In other words, Jennings argues that Hunt was correct in believing that Muszynski came forward first and that Muszynski and Kruger were wrong (and worse, lying) when they testified to the contrary. The only evidence Jennings cites to substantiate this view is Hunt's own testimony at the postconviction hearing that he believed Muszynski came forward first. Yet the state court has already considered and rejected Hunt's testimony in making the factual determination that "all of the credible testimony shows that [Kruger] came forward before Muszynski."[9] Merely repeating Hunt's testimony does not satisfy

_____

[9] The evidence cited by the trial court included the testimony of Muszynski and Kruger, as well as that of Wayne Porter, a case agent for the sheriff's office, who testified at the evidentiary hearing that, "I interviewed Kruger first, as I recall, and the case reports seem to reflect that. My report said that I interviewed Kruger on June the 21st of 1979, followed by another cell mate, and, then on the 25th, I again interviewed Kruger and Muszinski [sic]." Jennings V, 782 So. 2d at 857 n.5.

21

Jennings's burden to rebut this finding of fact by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1). The Florida Supreme Court could reasonably conclude that Hunt's notation was simply an error when considered in light of the other relevant evidence.[10] For the foregoing reasons, we agree that this notation from Hunt's interview would not have affected the outcome of sentencing.

Jennings places less significance on the remaining notations. The second notation bears on whether Muszynski was acting as an agent of the State when he discussed the crime with Jennings. In his notes, Hunt wrote "omit–no agency proof," which Jennings interprets somehow as suggesting that Kruger indicated that Muszynski approached Jennings on behalf of the State. We cannot say that Jennings's strained interpretation of the notation is persuasive. Moreover, Hunt denied that Muszynski was an agent of the State at the evidentiary hearing, and Muszynski confirmed this in testimony he gave before trial.[11]

---

[10] While Jennings's Brady claims are premised on the impeachment of Muszynski and Kruger, they completely overlook the independent testimony of Billy Crisco, to whom Jennings also confessed.

[11] As recounted by the Florida Supreme Court:
Moreover, trial defense counsel questioned Muszynski during voir dire about a possible agency relationship. Muszynski stated that he initiated contact with the State and defense counsel queried:
    Q: It is your testimony here that you were not approached by the State to act in the capacity of an agent or to obtain statements from [appellant] or any other person?
    A: No, sir. He gave it to me because he wanted somebody to look out for him at the prison.

22

The third notation, in Jennings's view, shows that the victim was unconscious from the beginning of the attack, contrary to Muszynski's testimony that Jennings's confession indicated that the victim regained consciousness before Jennings banged her head on the ground and drowned her. The notation from the Kruger interview reads:

> [Jennings] said "I dropped her out of a window. She was laying there but not dead. I picked her up by her legs and slammed her down on the concrete. I picked her up and carried her to the river for the sharks, turtles and crabs. I held her head under water for 10 minutes."

As the state court observed, the notation says nothing about the victim's consciousness and is substantially the same as Kruger's trial testimony. Jennings V, 782 So. 2d at 856. Last, the fourth notation reads "(doesn't recall [Jennings] saying anything about age of V or molesting her—after reading state.—could have.)" Jennings contends that this notation demonstrates that Kruger either had an unreliable memory or concocted his testimony. The state court, however, noted that Kruger apparently had no trouble recalling other incriminating statements of Jennings supporting the murder, kidnapping, and burglary convictions. Id. With respect to both the third and fourth notations, we agree that the mere omission of

---

Q: Did you approach him first about it?
A: No, sir, he came to me.

Jennings V, 782 So. 2d at 857.

23

some details—i.e., the mere silence of Kruger or his confessor Jennings—is not significant.

Jennings does not take issue with the Florida Supreme Court's individual discussion of these notations. Instead, as with the Slocum tape, he argues that the state court failed to analyze the potential effect of these notations from the Kruger interview on the penalty phase of the trial. But the reasons given by the court for rejecting Jennings's Brady claim are not limited to jury's guilty verdict. The state court's conclusion that the notations fall far short of constituting material impeachment evidence carries over with equal force to the penalty phase. Muszynski and Kruger, after all, did not testify separately at the penalty phase; their guilt-phase testimony sufficed to establish the facts necessary for imposing the death penalty. Because the standard for establishing those facts was the same in both phases of the trial, the conclusion that the prosecutor's notes were not material to the verdict also means that they were not material to the sentence. Contrary to Jennings's contention, the state court need not have expressly enunciated the penalty-phase implications of its conclusion. See Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) (emphasizing that AEDPA constrains federal courts to review the results, not reasons, of state court determinations). And, even if the notations were material, they would not impeach

the corroborating testimony of Crisco.  Plainly, the Florida Supreme Court could have reasonably concluded that the notations did not create a reasonable probability of a different outcome at sentencing.  As a result, Jennings is not entitled to habeas relief on the basis of the prosecutor's notes.

4.  The Muszynski Letter

While not the focus of his appeal, Jennings does refer to a separate piece of impeachment evidence that gave rise to a Brady claim in the state courts.  In a letter written to a state attorney in 1985, Muszynski requested the appointment of counsel because of his involvement in the Jennings case:

> I was interviewed and left a calling card by Wayne D. Porter, Investigator for your Office in reference to a murder case of a six year old child which had been sexually abused.
> In order for me to be able to communicate with your office for any possible assistance you may require of me I would appreciate if you would have an attorney appointed for me so that I will not infringe on any of my Fifth Amendment rights, being a layman, and that all discussions would be handled through said attorney representing me.

Jennings V, 782 So. 2d at 858 n.6.  The letter was not disclosed at trial, and Jennings contends that its contents reveal that Muszynski envisioned a quid pro quo exchange of legal representation for his testimony.  Like the other impeachment evidence discussed above, Jennings argues that this letter undermines the credibility of Muszynski's testimony and its value in establishing the HAC and

25

CCP aggravating factors, as well as the absence of any mitigating circumstances.

The Florida Supreme Court dismissed this claim without discussion in Jennings IV, 583 So. 2d at 322. In the subsequent appeal, the court noted that the revived claim was procedurally barred because it had been previously rejected, but it also addressed the merits to conclude that the letter did not "constitute Brady material because it does not establish a reasonable probability of achieving a different result." Jennings V, 782 So. 2d at 858 n.6. Specifically, the court found that, because the letter contained "only a request for counsel in order to avoid incriminating himself, Muszynski's letter does not evidence that he was seeking (or that the State was offering) an improper benefit that would lead Muszynski to fabricate testimony." Id. The letter self-evidently supports this conclusion. While disagreeing, Jennings does not explain how this conclusion is contrary to or an unreasonable application of Supreme Court precedent. An independent search has uncovered no Supreme Court decision that reaches an opposite conclusion on materially indistinguishable facts. Nor do we find that the state court's conclusion is an unreasonable application of the Bagley materiality standard.

For all the foregoing reasons, we affirm the denial of Jennings's habeas

26

petition based on the claimed <u>Brady</u> violations.[12]

B.  Ineffective Assistance of Counsel

Jennings next argues that his trial counsel rendered him ineffective assistance at the penalty phase in violation of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052 (1984).  He contends that his attorney failed to investigate and present additional evidence of his intoxication, which would support the "substantial impairment" mitigating factor and undermine the CCP aggravating factor.  We agree with the district court that the state court did not unreasonably apply the <u>Strickland</u> standard in rejecting these claims.  Also, Jennings argues that his counsel should have obtained and introduced impeachment evidence against Kruger and deposition testimony of Billy Crisco that contradicted his trial testimony.  The Florida Supreme Court found that Jennings had procedurally defaulted these claims.  Jennings has failed to show cause and prejudice for his default, and so he is not entitled to federal habeas review of these claims.

1.  <u>The Applicable Law</u>

---

[12] We also reject Jennings's general argument that the state court failed to undertake a cumulative review of the suppressed evidence in assessing materiality as required by <u>Kyles</u>, 514 U.S. at 436-37, 115 S.Ct. at 1567.  The Florida Supreme Court plainly satisfied this obligation: "Overall, the cumulative effect of the alleged <u>Brady</u> violations does not establish <u>Brady</u> materiality. The notes concerning the Kruger interview do not undercut confidence in the verdict. Moreover, the Slocum tape, Muszynski letter, and [other evidence not raised on appeal] do not require relief individually or collectively."  <u>Jennings V</u>, 782 So. 2d at 861-62.

27

Both parties agree that the United States Supreme Court's decision in Strickland provides the touchstone for Jennings's ineffectiveness claims. To prevail, Jennings must show, first, that his counsel's performance was deficient in that it "fell below an objective standard of reasonableness," id. at 688, 104 S.Ct. at 2064, and second, that the "deficient performance prejudiced the defense." Id. at 687, 104 S.Ct. at 2064. The prejudice prong of Strickland incorporates the same standard used for assessing the materiality of evidence under Brady, i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. at 2068. The two-prong Strickland test applies to the penalty phase as well as to the guilt phase. Mincey v. Head, 206 F.3d 1106, 1142 (11th Cir. 2000).

The Supreme Court has established certain principles and presumptions to guide our review of ineffectiveness claims under the flexible, case-specific standards of Strickland. We engage only in a "highly deferential" review of counsel's performance and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S.

28

at 689, 104 S.Ct. at 2065 (quotation omitted). As a result of this presumption, a petitioner must show "that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). Thus, "where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment." Id. at 1314 n.15 (quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir. 1999)). Moreover, because the standard is an objective one, trial counsel's admission that his performance was deficient "matters little." Id. at 1315 n.16. We must also avoid "the distorting effects of hindsight" and evaluate the reasonableness of counsel's performance from the perspective of counsel at the time the acts or omissions were made. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.

In preparing for a capital case, an attorney does have a duty to conduct a reasonable investigation into possible mitigating evidence. Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001). A total failure to investigate the defendant's past or present behavior can qualify as deficient performance under Strickland. Housel v. Head, 238 F.3d 1289, 1294 (11th Cir. 2001). However, effective assistance does not require that counsel investigate and present all evidence in mitigation. Chandler, 218 F.3d at 1319; Grayson, 257 F.3d at 1225. "The mere

29

fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (quotation omitted). As a result, it is not ineffective assistance to fail to present "redundant evidence." Id. at 1512. To assess the prejudice caused by counsel's alleged ineffective assistance at the penalty phase of a capital trial, we reweigh the evidence in aggravation against the totality of available mitigating evidence. Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542 (2003). The totality of the available mitigating evidence includes both evidence introduced at trial and the evidence introduced in the habeas proceeding. Williams, 529 U.S. at 397-98, 120 S.Ct. at 1515.

2. Additional Evidence of Intoxication

Jennings argues that his trial counsel was ineffective for failing to introduce the testimony of several people who witnessed his intoxicated condition on the night and morning of the murder. Jennings's counsel did call Russell Schneider and Catherine Music to testify during the penalty phase of the trial, but he did not call Annis Music, Patrick Clawson, or Floyd Canada, each of whom had some interaction with Jennings that night.

At the 1997 postconviction hearing, Annis Music testified that she spoke to

30

Jennings by telephone at 2:30 a.m. on the night of the murder. Jennings told her that he was "getting very drunk" and asked her to pick him up from the bar when she got off work at 4:00 a.m. She described his speech as "[s]lurred." Jennings was not at the bar at 4:00 a.m. when Annis stopped by there, but she saw Jennings between 5:00 a.m. and 6:00 a.m. when he returned home after the murder. According to Annis, Jennings "was very wide-eyed and, obviously, very intoxicated. He couldn't walk down the hall without banging into the walls." When asked if it appeared that he was doing any drugs in addition to alcohol, Annis answered, "I couldn't say for sure because I wasn't there, but, just by the way he looked, it could have been more than alcohol." Although Catherine Music described a similar scene at trial, she did not recall her daughter Annis being there at the time. Jennings's trial counsel, Vincent Howard, also testified at the hearing. He said that he had a note in his file, presumably from Jennings, reminding him to call Annis regarding Jennings's "appearance," but never did so. He opined that Annis Music's testimony describing Jennings's behavior would be "probative of his mental status and his ab[ility] to conform his conduct . . . to the law, and possibly on the issue of intent."

Patrick Clawson also testified at the 1997 hearing. He described Jennings as "pretty inebriated" at the time that he left the bar at 2:30 a.m. He noted that

Jennings had his arm around another person and was not "so sure [Jennings] could hold himself up, he was pretty drunk." Clawson also believed that, because of Jennings's condition, it was "kind of a stretch" that he could have forced open the window and screen, crawled into the victim's bedroom window, and pulled her out of bed as had been described at trial. On cross examination, the prosecutor reminded Clawson of a statement he had given police in June of 1979, less than a month after the murder, in which Clawson described Jennings as far more capable: "he wasn't falling down, but he might have had a slight stagger." Clawson did not disagree with his earlier assessment. Howard attempted to locate Clawson at the time of the third trial but was told that Clawson was stationed overseas in the military. Clawson was not stationed overseas. Jennings alleges that had Howard followed up with Annis Music, he would have discovered that she and Clawson were married and living in Panama City.

Although he did not testify at the postconviction hearing, Floyd Canada had earlier given a statement in which he described Jennings as "stagger[ing] pretty bad." Canada was a member of the group drinking with Jennings and Russell Schneider at the first bar, and he also accompanied Jennings to a second bar where they drank until 4:30 a.m. Canada was the last person to see Jennings before he approached Rebecca Kunash's window. At the 1997 hearing, Howard expressed

32

severe misgivings about calling Canada to testify. In an even earlier statement to police, Canada denied that Jennings appeared to be drunk and described his condition as "[j]ust normal, had a buzz on, he was high but he knew what he was doing." Howard recognized that if he tried to introduce Canada's later statement, he would be "cross examine[d] very, very hard" on the inconsistency.

Finally, Jennings claims that his trial counsel should have elicited testimony from Catherine Music that Jennings "looked kind of wild looking" that night, a statement she made to the assistant state attorney but apparently never volunteered to Jennings's attorney. Jennings became aware of this statement after receiving the State's files on remand from the first postconviction appeal. Howard testified that such a description would have been useful to present to the State's mental health experts as objective evidence of Jennings's intoxication.

The Florida Supreme Court rejected Jennings's ineffectiveness claims, concluding that his counsel's failure to introduce additional evidence did not fall short of the objective standard of reasonableness required by Strickland. Remarking on the evidence that was introduced at the penalty phase, the court noted that the testimony of Catherine Music and Schneider came from

> eye witnesses who observed his drinking experience and his physical condition just about three hours before and shortly after the murder. This coupled with the hypothetical question asked of the medical

experts to the effect that Jennings consumed from two to five gallons of beer in about four to six hours constituted a good effort to convince the jury to find intoxication as a mitigating factor.

Jennings IV, 583 So. 2d at 321. As for the additional evidence of intoxication, the court concluded that "[i]t is not negligent to fail to call everyone who may have information about an event." Id. In the second state postconviction appeal, the Florida Supreme Court stuck by its earlier conclusion that, notwithstanding the testimony of Annis Music that Jennings appeared "very intoxicated" and "banged into walls," Jennings's "ability to function" in carrying out the crime demonstrated that he was not substantially impaired. Jennings V, 782 So. 2d at 860. Therefore, counsel's failure to introduce the testimony of Annis Music did not prejudice Jennings because it did nothing to rebut Muszynski's description of Jennings's self-confessed actions. The court also rejected a successive claim based on Clawson's statement because it was "redundant of statements of Slocum, Annis Music, Catherine Music and Floyd Canada, and does not support a Strickland violation." Id. at 860 n.8.

Jennings argues that the state court unreasonably applied Strickland for three reasons. First, he argues that the only court to review the substantive merits of his claim, the Jennings IV court, did so without the aid of Howard's testimony at the 1997 postconviction hearing, which took place after the decision. Thus, the court's

34

conclusion that Howard would not have used the additional intoxication evidence amounts to "unsupported factfinding." Second, Jennings points out that Annis Music's testimony would have shown that Jennings had no preexisting plan to rape and murder Rebecca Kunash because he was trying to get a ride home from the bar. Third, and most significantly, the additional testimony would have, in Jennings's view, provided objective evidence of his intoxication, buttressing the testimony of the defense's expert witnesses and having the potential to persuade the State's experts that Jennings was substantially impaired.

The additional intoxication testimony would not have significantly strengthened Jennings's case for mitigation, and thus no prejudice resulted under Strickland by leaving it out. During the penalty phase, trial counsel introduced the testimony of two eyewitnesses, Schneider and Catherine Music, who established how much Jennings had been drinking and the extent of his intoxication before and after the murder. Counsel also elicited hypothetical, expert testimony that Jennings's drinking, when coupled with his personality disorders, could substantially impair his ability to conform his conduct to the law. As the Florida Supreme Court remarked, this was a "good effort to convince the jury to find intoxication as a mitigating factor." Jennings IV, 583 So. 2d at 321. Given the evidence actually presented, we cannot agree that the additional evidence Jennings

35

faults his counsel for omitting creates a reasonable probability that he would have received a different sentence. It was certainly not unreasonable to omit the testimony of Floyd Canada. Canada's pretrial statement would have subjected his trial testimony to crippling impeachment, and Howard's decision not to call Canada was clearly a strategic choice entitled to a presumption of reasonableness.

Even assuming that Howard was deficient for failing to call Annis Music (as Jennings requested he do), which would have led him to Clawson, we conclude that no prejudice resulted from the omission of their testimony. As the state court explained (in the context of Jennings's guilt-phase ineffectiveness claim), Annis's testimony "merely confirm[ed] that given by [Catherine] Music." Id. at 320. Both Catherine and Annis observed Jennings staggering and falling against the walls of Catherine's house. Likewise, Clawson's description of Jennings as "pretty inebriated" and having difficulty standing without aid was merely cumulative of Catherine's testimony (and less relevant because more remote in time from the murder). See Van Poyck v. Florida Dep't of Corr., 290 F.3d 1318, 1324 n. 7 (11th Cir. 2002) ("A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative."). Catherine Music's earlier description of Jennings as "wild looking," while somewhat different from her trial testimony, does not constitute the sort of

36

objective evidence of intoxication that Jennings now maintains would have swayed the opinions of the State's experts. Most importantly, none of the additional evidence directly calls into question Jennings's ability to carry out the rape and murder as Muszynski described, and as corroborated by Kruger and Crisco. Above all, it was the manner of the crime's execution that led the State's experts, and ultimately the trial court, to conclude that Jennings was not substantially impaired.

Jennings's other arguments also fail to persuade us. The additional evidence does not establish that Jennings lacked a preexisting plan for purposes of the CCP aggravator merely because he asked Annis to pick him up when she left work. Obviously, his premeditated intent to attack Rebecca Kunash did not hinge on the availability of a ride home. As for the argument that the state court improperly rejected Jennings's claims based on the "unsupported factfinding" that his trial counsel would not have used the additional testimony, it is irrelevant that Howard later testified he would have introduced such evidence in mitigation. The Strickland standard of objective reasonableness does not depend on the subjective intentions of the attorney, judgments made in hindsight, or an attorney's admission of deficient performance. Chandler, 218 F.3d at 1315 & n.16. And as we have said, even assuming that Howard was deficient, no prejudice ensued. Therefore,

Jennings has failed to show that the Florida Supreme Court's rejection of his ineffective assistance claims based on the additional intoxication evidence was contrary to or an unreasonable application of federal law.

3. Other Evidence

Jennings also raised ineffective assistance claims based on two other pieces of evidence that his trial counsel failed to uncover or introduce. First, notes of an interview between the state attorney and Billy Crisco showed that while confessing to the crime Jennings told Crisco that he "couldn't help it" and that the victim was unconscious throughout the ordeal. Second, according to documents filed in his own criminal case, Allen Kruger claimed to be suffering from delusions and requested a psychological examination by form motion in anticipation of an insanity defense. Neither was introduced at trial.

The Florida Supreme Court ruled both claims procedurally defaulted. The court held that the claim arising from the Crisco interview notes was not included in Jennings's initial postconviction petition, although the substance of the notation was already known to the defense. Thus, the court concluded that it was successive, and barred, when subsequently raised. Jennings V, 782 So. 2d at 861. The court found the claim arising from the Kruger court filings to be defaulted for two reasons. First, the claim was "time-barred since Kruger's motion contesting

38

his own sanity was filed in 1979 and [Jennings's] third trial was in 1986; thus postconviction relief based on this claim is barred by rule 3.850." Id. Second, the claim "exceed[ed] the scope of the remand ordered in [the first postconviction appeal], which was directed to public records in the State's possession." Id. Despite these procedural defects, the court also addressed the merits of the Kruger claim in an alternative holding, concluding:

> [T]he motion submitted by Kruger in his case was merely a form motion seeking an examination, and appellant has failed to submit in this case any follow-up orders or findings based on Kruger's motion that would actually evidence any mental incompetency. Thus, the trial court properly denied relief on this issue.

Id.

We will not ordinarily grant federal habeas review to claims that are procedurally defaulted because of "a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553 (1991). However, there are two exceptions. One is where the petitioner makes a showing of adequate cause and actual prejudice, and the other is where the failure to consider the claim would result in a fundamental miscarriage of justice. Id. at 722, 750, 111 S.Ct. at 2565. Attorney error may suffice to establish cause, but only where that error amounts to a constitutional violation under the Strickland standard. Murray v. Carrier, 477

39

U.S. 478, 488, 106 S.Ct. 2639, 2645 (1986).

Jennings does not attempt to demonstrate cause and prejudice that would excuse the default of his claim arising out of the Crisco interview notes. That is just as well. The error that led to the default—his state habeas counsel's failure to include the claim in the first round of state postconviction proceedings—would not give rise to a Strickland violation. See Coleman, 501 U.S. at 752-54, 111 S.Ct. at 2566-67 (because "[t]here is no constitutional right to an attorney in state post-conviction proceedings," attorney error at that stage would not qualify as cause excusing procedural default).

The Kruger court filings are a different matter. Jennings has alleged that his trial counsel was ineffective for failing to obtain this evidence, a claim that at least has the potential of establishing cause. However, we agree with the alternative holding reached by the Florida Supreme Court that Jennings has not suffered actual prejudice from the omission of the Kruger filings. The submission of a form motion containing self-reported incidents of delusions, without the corroboration of a follow-up psychological exam, does not represent such sufficient impeachment of Kruger's testimony that an "error of constitutional dimensions" resulting in a denial of "fundamental fairness" at trial has resulted from its omission. Carrier, 477 U.S. at 494, 106 S.Ct. at 2648 (quoting United States v. Frady, 456 U.S. 152, 170, 102

S.Ct. 1584, 1596 (1982)). Furthermore, Kruger was only one of three witnesses to describe the details of Jennings's confession. Impeaching Kruger would not affect the testimony of Muszynski or Crisco. Thus, at most, Jennings can show only the "possibility of prejudice," not the "actual and substantial disadvantage" required to excuse a defaulted claim. Id. (quoting Frady, 456 U.S. at 170, 102 S.Ct. at 1596).

For these reasons, Jennings is not entitled to habeas review of his procedurally barred ineffective assistance claims.

### C. The HAC Aggravating Factor

Jennings next argues that the Florida Supreme Court improperly upheld his death sentence despite concluding that the HAC aggravating factor was unconstitutionally vague. The United States Supreme Court has since held that the HAC aggravator, when not narrowed by a proper limiting instruction, is unconstitutional, and that neither the jury nor the trial judge may weigh the invalid aggravator. Espinosa v. Florida, 505 U.S. 1079, 1081-82, 112 S.Ct. 2926, 2928 (1992). No limiting instruction was given in this case.[13] The Florida Supreme

---

[13] Florida's Standard Jury Instructions now propose the following limiting instruction be given in cases where the HAC aggravator applies:

> The crime for which the defendant is to be sentenced was especially heinous, atrocious or cruel. "Heinous" means extremely wicked or shockingly evil. "Atrocious" means outrageously wicked and vile. "Cruel" means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. The kind of crime intended to be included as heinous, atrocious, or cruel is one accompanied by additional acts that show that the crime

Court nonetheless concluded that the erroneous application of the aggravator was harmless. Jennings contends that the court's decision runs afoul of Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441 (1990). We disagree.

In a weighing state like Florida,[14] the presence of an invalid aggravating factor in the weighing calculus renders a death sentence unconstitutional under the Eighth Amendment, and the sentence may not be automatically affirmed merely because "other valid aggravating factors exist." Sochor v. Florida, 504 U.S. 527, 532, 112 S.Ct. 2114, 2119 (1992). In Clemons, the Supreme Court held that a state appellate court may uphold the constitutionality of a death sentence, even where it is based on an invalid or improperly defined aggravator, if the court undertakes either a reweighing of the aggravating and mitigating evidence or harmless error

---

was conscienceless or pitiless and was unnecessarily torturous to the victim. Standard Jury Instructions in Criminal Cases, 690 So. 2d 1263, 1266 (Fla. 1997). These instructions derive from the Florida Supreme Court's decision in State v. Dixon, 283 So. 2d 1, 9 (Fla. 1973). The United States Supreme Court has upheld reliance on the HAC aggravator as narrowed by the construction offered in Dixon. Proffitt v. Florida, 428 U.S. 242, 255-56, 96 S.Ct. 2960, 2968 (1976).

[14] A weighing state is one in which the legislative narrowing of death-eligible defendants and the individualized sentencing determination are collapsed into a single step and based on an evaluation of the same sentencing factors. See Brown v. Sanders, 126 S.Ct. 884, 890 (2006). In order to ensure that the process satisfies the constitutionally mandated narrowing function, all aggravators must be defined by statute and must identify "distinct and particular aggravating features." Id. In a nonweighing state, however, eligibility and the actual sentence are determined separately. Thus, once eligibility has been determined, the sentencer in a nonweighing state can give aggravating weight to all the facts and circumstances of the crime, not just those that are statutorily defined, without violating the narrowing requirement. Id.

review. 494 U.S. at 741, 110 S.Ct. at 1444. To find an error harmless, the state court must employ the "beyond a reasonable doubt" standard of Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828 (1967). Clemons, 494 U.S. at 753, 110 S.Ct. at 1451. In the case before it (which also involved the "especially heinous, atrocious, and cruel" aggravating circumstance), the Supreme Court in Clemons identified two different permissible approaches to conducting harmless error review. First, the state court could have determined that the "sentence would have been the same even if there had been no 'especially heinous' instruction at all," balancing the remaining aggravators against the mitigating circumstances. Id. Second, the state court could "ask whether beyond reasonable doubt the result would have been the same had the especially heinous aggravating circumstance been properly defined in the jury instructions." Id. at 754, 110 S.Ct. at 1451. Reviewing the state court opinion at issue, the Court could not tell whether either form of harmless error review had been followed. The state court's cryptic holding stated only that the result would have been the same "with or without" the HAC instruction. Id. at 753, 110 S.Ct. at 1451.

Here, however, we have no trouble concluding that the Florida Supreme Court performed a proper harmless error review. In its primary holding, the court took the second route endorsed by the Supreme Court in Clemons, finding that

43

"beyond a reasonable doubt . . . the HAC aggravator would have been found with a proper instruction." Jennings V, 782 So. 2d at 863. The court quoted at length from Muszynski's testimony to show that Jennings choked Rebecca Kunash unconscious when he entered her bedroom, and that she later regained consciousness, began screaming, and tried to fight off her attacker, at which point Jennings twice smashed her head into the curb. Id. Florida law clearly provides that such infliction of suffering on a conscious victim satisfies the HAC aggravator, properly defined. See id. (citing Robertson v. State, 699 So. 2d 1343, 1347 (Fla. 1997) ("This Court consistently has found this aggravator to apply where, as here, a conscious victim is strangled."); Adams v. State, 412 So. 2d 850, 857 (Fla. 1982) ("The fear and emotional strain preceding a victim's almost instantaneous death may be considered as contributing to the heinous nature of the capital felony . . . . From defendant's statement we find the victim was 'screaming' prior to death. A frightened eight-year-old girl being strangled by an adult man should certainly be described as heinous, atrocious, and cruel.")). In fact, not only has the United States Supreme Court approved this method of harmless error review, it has also upheld this very rationale. See Sochor, 504 U.S. at 537, 112 S.Ct. at 2121 ("Our review of Florida law indicates that the State Supreme Court has consistently held that heinousness is properly found if the defendant strangled a conscious victim.").

44

It is clear that the Florida Supreme Court properly followed <u>Clemons</u> in finding

that the application of the vague HAC instruction to Jennings's sentence was

harmless.[15]

Jennings, however, faults the Florida Supreme Court for conducting an

improper reweighing by, for instance, failing to give sufficient weight to the

proffered mitigating evidence or conducting a cumulative review of that evidence.

We do not read the court's opinion as undertaking a reweighing of the aggravating

and mitigating circumstances. Under <u>Clemons</u>, either reweighing or harmless error

review alone suffices. The method of the Florida Supreme Court's analysis here

fits perfectly within the model of harmless error review provided by the Supreme

Court in <u>Clemons</u>. Additionally, the Florida Supreme Court has itself said that it

does not reweigh evidence when reviewing a death sentence. <u>See, e.g.</u>, <u>Hudson v.</u>

---

[15] Alternatively, the Florida Supreme Court concluded that the death sentence would have been imposed even if the HAC aggravating factor had been stricken, not just properly defined for the jury. <u>Jennings V</u>, 782 So. 2d at 863-64 n.9. The court reached this conclusion based on the remaining two aggravators—the CCP and felony aggravators—and the lack of mitigating evidence. In light of our holding that the Florida Supreme Court properly followed the other <u>Clemons</u> approach, we need not address this alternative holding. However, we entertain some doubt whether the error could properly be viewed as harmless if the aggravator were stricken as opposed to limited by jury instruction. That is because the court also based its conclusion on the "brutal nature of the crime," <u>id.</u> at 864 n.9, which could be read as relying on the same aggravating facts as those supporting HAC. Moreover, the prosecutor emphasized the nature of the crime in his sentencing argument. <u>See</u> <u>Clemons</u>, 494 U.S. at 753, 110 S.Ct. at 1451 (finding harmlessness of stricken HAC aggravator "difficult to accept" where the "State repeatedly emphasized and argued the . . . factor during the sentencing hearing"). Harmless error review premised on a correct definition of the aggravator does not raise these concerns, however.

<u>State</u>, 538 So. 2d 829, 831 (Fla. 1989) ("It is not within this Court's province to reweigh or reevaluate the evidence presented as to aggravating or mitigating circumstances."). Thus, Jennings's arguments regarding the court's alleged errors in assigning insufficient weight to the proffered mitigating evidence or for failing to view the evidence cumulatively are beside the point. The court need only have answered the question of whether the aggravator would have been found with a proper instruction beyond a reasonable doubt. Consequently, we find no grounds for viewing the Florida Supreme Court's harmless error analysis as contrary to or an unreasonable application of clearly established federal law.[16]

D.    The CCP Aggravating Factor

In the final challenge to his death sentence, Jennings contends that the CCP

---

[16] Jennings also maintains that the Florida Supreme Court relied on an improper "sufficiency of the evidence" standard in determining that the error was harmless when it stated that Muszynski's testimony provided "sufficient evidence to support finding the crime heinous, atrocious, or cruel." <u>Jennings V</u>, 782 So. 2d at 863. As noted above, however, the court concluded its analysis by finding "beyond a reasonable doubt that the HAC aggravator would have been found with a proper instruction." Thus, the Florida Supreme Court followed the appropriate <u>Chapman</u> standard. The United States Supreme Court has emphasized that state harmless error review to cure Eighth Amendment violations does not depend on "a particular formulaic indication" but rather requires only "a plain statement that the judgment survives on such an enquiry." <u>Sochor</u>, 504 U.S. at 540, 112 S.Ct. at 2123. The Florida Supreme Court's discussion more than satisfies this requirement. We understand the reference to "sufficient evidence" to mean only that the evidence introduced at trial supported the properly defined HAC aggravator to such an extent that the aggravator would have been found beyond a reasonable doubt. Otherwise, accepting Jennings's argument would require us to adopt a "'grading papers' approach" that is incompatible with the deferential review we owe state court determinations under AEDPA. <u>Wright</u>, 278 F.3d at 1255.

aggravator was retroactively applied to his offense in violation of the Ex Post Facto

Clause of the Constitution.  The aggravator became effective on July 5, 1979, two

months after the murder.  See 1979 Fla. Laws, ch. 79-353.  In dismissing Jennings's

petition for federal habeas relief, the district court agreed that there had been an ex

post facto violation, but nonetheless concluded that the error was harmless.

Jennings appeals from the court's harmless error determination, while the State has

filed a cross appeal to contest the court's conclusion that the aggravator was ex post

facto.  We need not decide whether reliance on the CCP aggravator violated the Ex

Post Facto Clause, however, because Jennings's claim fails in any event.  For

purposes of this decision, we will assume, without deciding, that an ex post facto

violation has occurred.[17]  Nevertheless, we agree with the district court that any

---

[17] In its cross appeal, the State argues that our prior decision in Francis v. Dugger, 908 F.2d 696 (11th Cir. 1990), has already held that the CCP aggravator does not violate the Ex Post Facto Clause when retroactively applied.  In Francis, we found that the "facts on which the trial judge relied in applying the 'cold, calculated, and premeditated' factor were the same facts underlying application of other aggravating factors, such as 'hindering law enforcement' and 'especially atrocious and cruel.'" Id. at 705 (quoting Francis v. Dugger, 697 F. Supp. 472, 482 (S.D. Fla. 1988)).  We therefore concluded that application of the CCP aggravator "did not disadvantage" the petitioner and thus "no ex post facto violation occurred." Id.  Jennings argues that the holding of Francis derives from principles of harmless error review, not from pure ex post facto principles.  In light of our holding, we need not decide the proper interpretation of Francis. It is true that the manner of the analysis—looking to the other evidence presented at sentencing to determine the effect of the CCP aggravator—certainly resembles harmless error review.  And the district court in Francis clearly found that error had occurred, but upheld the sentence after reviewing the remaining aggravators.  See Francis, 697 F. Supp. at 482 ("Although the trial judge erred in adding 'cold, calculated, and premeditated' as a separate aggravating factor, it was proper for him to consider those specific circumstances in sentencing." (emphasis added)).  Yet our opinion stated flatly that "no ex post facto violation had occurred" and

47

error was harmless.

The district court conducted harmless error review without the Florida Supreme Court's having attempted its own such analysis.[18] We have yet to endorse federal harmless error review of death sentences based on invalid sentencing factors when the state appellate court has not performed its own harmless error analysis. By our count, five circuit courts of appeals have authorized such an approach. See Coe v. Bell, 161 F.3d 320, 334 (6th Cir. 1998); Billiot v. Puckett, 135 F.3d 311, 318 (5th Cir. 1998); Davis v. Executive Dir. of Dep't of Corr., 100 F.3d 750, 768-69 n.18 (10th Cir. 1996); Williams v. Clarke, 40 F.3d 1529, 1539-40 (8th Cir. 1994); Smith v. Dixon, 14 F.3d 956, 974-81 (4th Cir. 1994) (en banc). Of the five, the Fourth Circuit's decision in Smith v. Dixon provides the most comprehensive discussion. The Smith court recognized that the United States Supreme Court has never approved federal harmless error review in circumstances such as these. In fact, whenever the Court has invalidated a death sentence on direct review, it has

_____

deliberately omitted the reference to error when quoting from the district court's order. Because we dispose of Jennings's ex post facto claim on harmless error grounds, we have no occasion to resolve the asserted ambiguity of Francis.

[18] The Jennings V court did conduct harmless error analysis of the CCP aggravator, but for a different kind of error. In the state court, Jennings argued that, in addition to being ex post facto, the CCP aggravator was unconstitutionally vague. In Jennings V, the court recounted the relevant facts of the offense and concluded that Jennings's crime was "CCP under any definition." 782 So. 2d at 862. Because the Florida Supreme Court found no ex post facto violation, it conducted no harmless error analysis assuming such a violation and thus assuming that it was error for the CCP aggravator to have been submitted to the jury.

48

remanded the case back to the state appellate court to give it an opportunity to review the sentence for harmless error (or, alternatively, to reweigh the sentence). See Richmond v. Lewis, 506 U.S. 40, 52, 113 S.Ct. 528, 537 (1992); Parker v. Dugger, 498 U.S. 308, 322-23, 111 S.Ct. 731, 740 (1991); Clemons, 494 U.S. at 754, 110 S.Ct. at 1451. In Richmond, the Court used language that could be construed as reserving the reweighing of death sentences to state courts: "Where the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor, the state appellate court or some other state sentencer must actually perform a new sentencing calculus, if the sentence is to stand." Richmond, 506 U.S. at 49, 113 S.Ct. at 535 (emphases added).

And yet, as the Fourth Circuit observed, none of these decisions squarely addresses the issue of federal district courts conducting harmless error review in place of state courts. See Smith, 14 F.3d at 977. Indeed, the Supreme Court's references to state-only reformation of capital sentencing errors read most naturally as a limit on the reweighing of sentences, not on the ability of federal courts to engage in harmless error analysis. See id. at 977-78 (discussing Richmond). The distinction between harmless error review and reweighing is a meaningful one. Whereas the reweighing of aggravating and mitigating evidence calls for assessing the relative value of factual evidence normally left to the province of state courts,

"[h]armless error analysis must necessarily be conducted on a cold record, whether the court be federal or state." Id. at 978. Like the Fourth Circuit, we do not read the Supreme Court's decisions as foreclosing federal courts from performing harmless error review in these circumstances.

In fact, the general rule requires federal habeas courts to perform harmless error review of state court trial-type errors. See Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 1721-1722 (1993) (directing courts to determine whether constitutional errors at trial "had a substantial and injurious effect or influence in determining the jury's verdict" (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)). And it is equally clear that the Supreme Court has endorsed harmless error review of death sentences supported in part by invalid aggravators. Clemons, 494 U.S. at 752-54, 110 S.Ct. at 1450-51. We have no trouble concluding that harmless error review by federal courts is also appropriate when state courts have not undertaken such a review themselves.[19]

---

[19] Our holding that federal courts may conduct harmless error review of ex post facto violations is limited to the situation where the violation leads to the invalidation of an aggravating sentencing factor, which poses an Eighth Amendment concern. We need not address whether harmless error review is available for ex post facto violations generally. In other words, we need not address the possibility that other ex post facto violations could be viewed as "structural errors" not subject to harmless error review, see Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 1833 (1999) (enumerating exceptions to the general rule that constitutional errors are subject to harmless error review), or something else entirely. See Williams v. Roe, 421 F.3d 883, 887-88 n.2 (9th Cir. 2005) (refusing to review ex post facto violation for harmless error based on the conclusion that such errors cannot be categorized as either "trial-type" or

50

We therefore review the inclusion of the CCP aggravator to determine whether it had a "substantial and injurious effect or influence" on Jennings's death sentence. Brecht, 507 U.S. at 637-38, 113 S.Ct. at 1721-22.[20] We conclude that it did not. As discussed in the preceding sections, the Florida Supreme Court properly determined that Jennings's death sentence was supported by two valid aggravating factors—committed while engaged in the commission of a felony and HAC—and by the absence of any statutory mitigating factors. Although an ex post facto error is not harmless merely because the aggravators outnumber the mitigators, see Hargrave v. State, 366 So. 2d 1, 5 (Fla. 1978) (abjuring the "mere tabulation of aggravating versus mitigating circumstances to arrive at a net sum"), after careful review, we find nothing about the facts of this case to suggest that application of the CCP aggravator contributed substantially to Jennings's ultimate sentence.

The primary effect of the aggravator was to grant the jury and the trial judge

"structural"). Where, as here, the detrimental effect of the ex post facto violation cannot be separated from the risk posed by allowing consideration of an invalid aggravator, it would be incongruous to permit harmless error review of the latter, which is routine, but not the former.

[20] Under established circuit precedent, we employ the more deferential Brecht standard even where the state court did not apply the Chapman standard of proof "beyond a reasonable doubt that the error complained of did not contribute to the verdict." See Ross v. United States, 289 F.3d 677, 682 (11th Cir. 2002) ("[W]e . . . have rejected the theory that the Brecht standard only applies to convictions which have been previously reviewed under the Chapman standard."). The propriety of this approach is a question currently pending before the Supreme Court. Fry v. Pliler, 127 S.Ct. 763 (Dec. 7, 2006) (mem.).

51

authority to give aggravating weight to the facts underpinning CCP.[21] We find that these facts played little or no role in the sentencing determination. In his penalty-phase argument, the prosecutor summarized the evidence supporting the CCP aggravator as follows:

> The defendant went to the location, looked in the window, left, decided to come back. He decided to enter the window, decided to check out who was in that house to make sure he would not be detected when he abducted the child. Who stealthily, not only entered, but exited, so no one would detect him. He takes her to an isolated area so that he can do whatever he wants, and what does he do? Sexually assaults her. When she comes around where she might be able to yell or give warning, he bashes her head. And when he is finished, he drowns her.

The trial judge made the following findings of fact in support of the aggravator:

> The Defendant had driven by her house earlier in the evening, gone to her window and saw her asleep. He left only to return a short time later. At that time, he made a conscious decision to enter her room and did so. Rebecca Kunash offered no threat to the Defendant. From the initial abduction to the final premeditated act of drowning her, the Defendant's acts represented a cold and calculated indifference to the feelings or life of Rebecca Kunash.

Between the prosecutor's argument and the trial judge's statement of facts, it is clear that only two distinct sets of facts and circumstances were given aggravating weight

---

[21] The availability of the aggravator also could have permitted the State to introduce new evidence tending to show CCP at the penalty phase. See Fla. Stat. § 921.141(1). However, the only new evidence offered by the State was the testimony of two expert witnesses called to rebut Jennings's mitigation evidence. The distinct facts cited to support the aggravator derived solely from the guilt-phase testimony of Muszynski, Kruger, and Crisco. Without question, then, the aspect of the aggravator permitting the admission of new evidence did not affect Jennings's sentence.

under the CCP aggravator: (1) the premeditation evinced by Jennings's decision to return to Rebecca Kunash's window and enter her bedroom, and (2) his actions in carrying out the kidnapping, sexual assault, and murder, specifically Jennings's decision to kill Rebecca once she regained consciousness and was able to cry out for help.

We find that the second of these was properly given aggravating weight under the felony and HAC aggravating factors, and thus no aggravation for this set of facts can be attributed to the CCP aggravator for ex post facto purposes. The Florida Supreme Court has consistently ruled that the HAC aggravator concerns whether the State proved that the defendant had the "intent to inflict a high degree of pain or otherwise torture the victims." Hamilton v. State, 678 So. 2d 1228, 1231 (Fla. 1996). Key to this finding is the suffering experienced by a conscious victim. Thus, as already mentioned, strangulation of a conscious victim satisfies the requirements of a properly defined HAC aggravator. For the same reason, the court has refused to treat instantaneous or near-instantaneous deaths, when not accompanied by additional acts of mental or physical torture, as heinous, atrocious, or cruel. See, e.g., Rimmer v. State, 825 So. 2d 304, 327-28 (Fla. 2002). From this perspective, it is plain that Jennings's decision to murder Rebecca in the manner that he did once she became conscious falls under the factual rubric designated by the HAC

53

aggravator. In fact, it is identical to the prosecutor's argument in support of HAC:

"And when she comes around, when she starts to become conscious again, what is

done? She is lifted up above his head and smashed onto the concrete, not once, but

twice, to keep her quiet." The trial judge described the same aspect of Rebecca's

death in approving the finding of HAC. As to the manner of Rebecca's death and

the suffering she experienced, the CCP aggravator had no effect on Jennings's

sentence because these facts were already given aggravating weight under HAC.

That conclusion flows directly from our prior decision in Francis v. Dugger,

discussed above. See supra note 17. It is also supported by the United States

Supreme Court's recent decision in Brown v. Sanders, 126 S.Ct. 884 (2006), in

which the Court set out an analysis similar to the approach we took in Francis.

Reviewing a California death sentence imposed where two of the four aggravating

factors were subsequently invalidated, the Court in Brown announced a new rule for

determining when constitutional error will result from the application of invalid

aggravators:

> An invalidated sentencing factor (whether an eligibility factor or not)
> will render the sentence unconstitutional by reason of its adding an
> improper element to the aggravation scale in the weighing process
> unless one of the other sentencing factors enables the sentencer to give
> aggravating weight to the same facts and circumstances.

Id. at 892 (footnote omitted). The Court explained that the "skewing that could

result from the jury's considering <u>as aggravation</u> properly admitted evidence that should not have weighed in favor of the death penalty" would arise "only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." <u>Id.</u> Thus, no constitutional error results where the facts underlying an invalid aggravator also support a valid aggravator. That is because, in cases where the <u>Brown</u> condition is met, the constitutionally impermissible aggravator does not lend any additional aggravating weight to the facts and circumstances common to the aggravators. The Court upheld the death sentence before it because the California death penalty scheme permitted the sentencer to consider an omnibus aggravating factor that included all the "circumstances of the crime." <u>Id.</u> at 893. There was no question then that the facts supporting the invalid aggravators were properly considered by the sentencer under the omnibus factor.[22] <u>Id.</u>

_____

[22] Although omnibus sentencing factors are a hallmark of nonweighing states, it is probable that the Court's decision in <u>Brown</u> announced a uniform rule to be applied in weighing and nonweighing states alike. This is indicated by the Court's statement that it was "leaving aside the weighing/nonweighing dichotomy and proceeding to [a] more direct analysis." <u>Brown</u>, 126 S.Ct. at 893. The few courts and commentators to have considered <u>Brown</u> since it was handed down appear to agree. <u>See</u> <u>Spisak v. Mitchell</u>, 465 F.3d 684, 713 (6th Cir. 2006) (applying <u>Brown</u> to uphold a death sentence from Ohio, a weighing state); <u>Slagle v. Bagley</u>, 457 F.3d 501, 521 n.3 (6th Cir. 2006) (dicta) ("The Supreme Court decided no longer to distinguish between so-called weighing and nonweighing states when an eligibility factor has been held to be invalid. Instead, the Supreme Court propounded a uniform rule."(citation omitted)); 1 Wayne R. LaFave, Substantive Criminal Law § 3.5, at 16 n.112 (2d ed. Supp. 2007) ("While an approach different from that in <u>Zant</u> was once used in so-called 'weighing statutes,' the Court later, in <u>Brown v. Sanders</u>, adopted a single rule for all statutes . . . ." (citations omitted)); The

Brown holds that the subsequent invalidation of an aggravating factor will constitute constitutional error "only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." Id. at 892. Jennings misreads the Court's Brown decision by arguing the converse of the rule, and then extending its application: according to Jennings, if the remaining, valid sentencing factors do not enable the sentencer to give aggravating weight to the same facts and circumstances, then constitutional error is unavoidable and may not be reviewed for harmless error. But the Brown decision does not bar courts from engaging in harmless error review; in fact, the Court recognized the continuing need for harmless error review in

Supreme Court, 2005 Term—Leading Cases, 120 HARV. L. REV. 134, 144 (2006) ("The new Sanders rule clarifies and provides predictability to the weighing-nonweighing distinction by jettisoning it in favor of a simplified rule." (emphasis added)).

We need not decide in this case whether the Brown rule applies in weighing states. Even if the Brown rule does not apply in its pure form—i.e., to eliminate constitutional error—the same rationale clearly indicates that any error in considering the CCP aggravator was harmless in this case.

We do note, however, that aggravating factors in weighing states necessarily serve the dual purpose of establishing a defendant's eligibility for the death penalty in addition to his actual sentence. The eligibility determination must separately satisfy the requirement stated in Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742 (1983), that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." By its own terms, the rule announced in Brown addresses only the role of an invalid aggravator as a factor in aggravation, not as a factor in the eligibility determination. Courts applying the Brown rule in weighing states must therefore assure themselves that the remaining, valid aggravators fulfill the narrowing function described in Zant. In the present case, we conclude that the presence of two valid aggravating factors, in the absence of any mitigating factors, satisfies this function.

56

weighing states like Florida when it distinguished weighing from nonweighing states.  Id. at 890-91 n.3.  Brown therefore deals only with the threshold matter of deciding when constitutional error has resulted from reliance on invalid aggravators, not with how appellate courts can remedy the error short of resentencing.

Jennings also argues that the Brown rule cannot apply here (or indeed in any Florida death penalty case) because under Florida law, aggravating factors may never overlap and may never refer to the same aspect of the crime.  Jennings here refers to the state prohibition on double counting aggravators when they arise out of the same facts and circumstances.  See Provence v. State, 337 So. 2d 783, 786 (Fla. 1976) (merging aggravating factors of "committed during commission of a robbery" and "committed for pecuniary gain" where those factors subsumed the same aspect of the crime).  Even Jennings recognizes, however, that in such situations, Florida law instructs juries and trial judges to merge the overlapping aggravating circumstances into a single factor for the purpose of giving aggravating weight to the underlying facts.  See, e.g., Francis v. State, 808 So. 2d 110, 137 (Fla. 2001); see also Standard Jury Instructions, 690 So. 2d at 1267 ("The State may not rely upon a single aspect of the offense to establish more than one aggravating circumstance.  Therefore, if you find that two or more of the aggravating circumstances are proven beyond a reasonable doubt by a single aspect of the offense, you are to consider that

57

as supporting only one aggravating circumstance.”).

Properly viewed, Florida law does not preclude application of the rule announced by the Supreme Court in Brown. Rather, the prohibition on double counting presupposes that aggravators may sometimes share common facts and circumstances. The state law merger rule can therefore be read as anticipating the Brown rule, as both recognize the principle that no improper aggravation occurs where the same facts can be considered under a valid, remaining aggravating factor. In this case, the death sentence was supported by both the HAC and CCP aggravators. And here, the most significant facts receiving aggravating weight under CCP—facts related to the manner of the killing and the victim's suffering—could and did receive the same emphasis under HAC. Thus, as to these facts, the CCP aggravator had no effect on Jennings's sentence.

The only factual circumstance that could possibly have received improper aggravating weight was Jennings's decision to return to the victim's window after looking in on her earlier in the evening.[23] This fact alone, when compared to the other aspects of Jennings's crime—his callous indifference to the suffering of his

---

[23] In light of our holding that the jury's consideration of this fact cannot have had a substantial and injurious effect on Jennings's sentence, we need not decide whether this fact, like the facts related to the manner of the victim's suffering and death, could have been given aggravating weight under the felony and HAC aggravating factors.

young victim, the brutal, unrelenting ferocity of his attack, and the violent manner in which he dashed her head against the curb—cannot be viewed as a substantial motive in the decision to impose the death sentence in this case. Even when viewed in isolation, the level of premeditation evinced by Jennings's actions does not stand out as particularly egregious, especially when compared to the execution-style contract killings that the Florida Supreme Court has offered as the paradigm of the CCP aggravator. See, e.g., Scott v. State, 494 So. 2d 1134, 1138 (Fla. 1986); McCray v. State, 416 So. 2d 804, 807 (Fla. 1982). Given the absence of statutory mitigating evidence, the presence of two valid aggravating factors, and the heinous nature of the crime, we conclude that the CCP aggravator produced no substantial and injurious effect on Jennings's sentence. Thus, any ex post facto violation was harmless, and the district court properly denied Jennings relief on his habeas petition.

## IV. CONCLUSION

For the foregoing reasons, the district court properly denied Jennings's 28 U.S.C. § 2254 petition. Accordingly, the district court's order is

**AFFIRMED**.